967 A.2d 285 (2009)
198 N.J. 219
STATE of New Jersey, Plaintiff-Appellant,
v.
Dionte BYRD, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Freddie Dean, Jr., Defendant-Respondent.
A-105 September Term 2007.
Supreme Court of New Jersey.
Argued January 5, 2009.
Decided April 2, 2009.
*287 Daniel I. Bornstein, Deputy Attorney General, argued the cause for appellant (Anne Milgram, Attorney General of New Jersey, attorney).
Andrew F. Schneider argued the cause for respondent Dionte Byrd.
Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for respondent Freddie Dean, Jr. (Yvonne Smith Segars, Public Defender, attorney; Mr. Friedman and William P. Welaj, Former Designated Counsel, on the briefs).
Sharon Bittner Kean, Madison, argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey.
Justice ALBIN delivered the opinion of the Court.
Witness intimidation in cases involving gangs, drug racketeers, organized crime, and domestic violence has become a significant challenge to the criminal justice system. In this appeal, we must decide whether, under our Rules of Evidence, a witness's hearsay statement implicating a defendant in a crime should be admissible, when through violence, intimidation, or other unlawful means, the defendant makes the witness unavailable to testify at trial.
We now hold that the time has come for New Jersey to follow the course taken by many other jurisdictions and codify a forfeiture-by-wrongdoing exception to the hearsay rule. That rule will allow the admission of a witness's statement offered against a party who has engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the witness. A forfeiture-by-wrongdoing rule will achieve three important policy objectives. First, it will ensure that a criminal defendant will not profit from making a witness unavailable to testify. Second, it will provide a powerful disincentive *288 against witness intimidation. Last, it will further one of the primary goals of every trialthe search for truth. The proposed evidence rule will likely have farranging consequences in the trial of both criminal and civil cases. Therefore, in accordance with the Evidence Act, 1960, N.J.S.A. 2A:84A-33 to -44 (Evidence Act), we will forward to the Senate, General Assembly, and Governor, for their urgent consideration, the adoption of a forfeiture-by-wrongdoing exception to the hearsay rule.
We agree with the Appellate Division that the criminal convictions of the two defendants in this case must be reversed. First, the trial court introduced the statement of a witness, who allegedly was made unavailable by intimidation, at a time when there was no forfeiture-by-wrongdoing exception in our evidence rules. Second, even had there been a codified rule, the hearsay statements of the allegedly threatened witness would not have been admissible because the trial court examined the witness ex parte, outside the presence of defendants and their counsel, denying defendants their right of confrontation. Moreover, the court took testimony without placing the witness under oath and did not permit defendants the opportunity to present evidence to rebut the State's evidence of intimidation. We therefore are compelled to remand for a new trial.

I.

A.
Defendants Dionte Byrd and Freddie Dean, Jr. were indicted by a Mercer County grand jury for crimes related to the killing of Charles Simmons. They were tried together before a jury during a four-week trial in 2004. The essential facts revealed that on the evening of August 26, 2001, Byrd and Dean hatched a plan to rob Simmons, a known drug dealer. They traveled to Simmons's Trenton apartment, along with Kenneth Bush, in a van driven by Hassan Wilson. At their destination, Byrd, wielding a shotgun, and Dean, armed with a nine-millimeter handgun, exited the van, leaving behind Wilson and Bush. When Byrd and Dean knocked on the door to Simmons's apartment, Clinton Fudge, one of the apartment's four occupants, heard a voice on the other side saying, "Mini, Mini, Mini, Mini," Simmons's nickname. After Fudge cracked open the door, Byrd and Dean forced their way inside and ordered Fudge to lie down on the floor. Apparently hearing the commotion, Simmons emerged from a back room and confronted the armed assailants. Simmons engaged in a struggle with Dean during which Dean's handgun discharged four times. One of the shots struck Simmons in the upper chest at point-blank range killing him. Another shot struck defendant Byrd in the thigh. Both defendants then fled the apartment, entered the van, and made their getaway. Fudge was the only eyewitness to testify about what occurred in the apartment. The jury heard from other witnesses about the events leading up to and following the shooting.
At the conclusion of the trial, both Byrd and Dean were convicted of felony murder, N.J.S.A. 2C:11-3(a)(3), first-degree aggravated manslaughter (as a lesser-included offense of murder), N.J.S.A. 2C:11-4(a)(1), and first-degree robbery, N.J.S.A. 2C:15-1(a) and (b). The jury also convicted Byrd of third-degree unlawfully possessing a loaded shotgun, N.J.S.A. 2C:39-5(c)(2), and of possessing a shotgun for an unlawful purpose, N.J.S.A. 2C:39-4(a), and convicted Dean of third-degree unlawfully possessing a handgun, N.J.S.A. 2C:39-5(b), and of second-degree possessing a hand-gun *289 for an unlawful purpose, N.J.S.A. 2C:39-4(a).[1]
The trial court sentenced both defendants on the felony-murder conviction to life imprisonment with a thirty-year minimum parole-ineligibility period. Byrd received a concurrent ten-year term with a five-year parole disqualifier for possessing a shotgun for an unlawful purpose, and Dean received a concurrent ten-year term with a five-year parole disqualifier for possessing a handgun for an unlawful purpose. The remaining charges were merged with those convictions.

B.
The heart of this case concerns the introduction into evidence of Kenneth Bush's out-of-court statement, made to two Trenton police detectives, implicating both Byrd and Dean in the robbery and killing of Simmons. Nine days following Simmons's shooting, Bush was interrogated by the two detectives, who transposed the questions and answers onto a nine-page typewritten statement, which Bush signed and dated.
In that statement, which was read to the jury, Bush related that on the day of Simmons's shooting he observed defendant Dean carrying a nine-millimeter handgun. Later that evening, Bush was riding in a van with defendants Byrd and Dean driven by Hassan Wilson. After driving around Trenton for fifteen to twenty minutes, Wilson parked on a street corner, where Byrd and Dean exited. They said that "they were going to check something out and they would be right back." While they were gone, Bush smoked crack in the back of the van.
Approximately five or ten minutes later Byrd and Dean "came running" back into the van, with Byrd exclaiming in words punctuated with expletives that Dean had shot him. Inside the van, Byrd continued ranting at Dean, "[Y]ou were shooting real crazy.... [Y]ou know you shot me, I don't believe you shot me." Dean retorted that "somebody came out with a gun and [was] shooting, too," and added, "[M]an, I put it in him. I let off on him." Dean was holding the same handgun that Bush had observed him with earlier in the day. The slide to the nine-millimeter handgun was open, suggesting that all the bullets had been fired from the gun. Dean repeated that someone in the apartment had a shotgun and that Byrd had been "hit with a pellet," but Byrd insisted that he "didn't see nobody else with a gun."
Eventually, they drove to the home of Dean's cousin. There, Bush viewed Byrd's leg wound while Dean and Byrd continued to argue about how Byrd had been shot. In an attempt to prove his point that, perhaps, Byrd had shot himself, Dean picked up Byrd's shotgun and "cracked it open." Out popped an "unspent" shell indicating that the shotgun had not been fired. During the course of this debate, Bush continued to consume crack. When two guests came to the house with the news that "the guy who got shot may die," Bush decided it was time to leave.[2]
*290 The court also permitted the jury to hear that Bush handwrote and signed an affidavit, provided to the defense, recanting his statement to the two detectives. In his affidavit, Bush attested that the two detectives had arrested him on charges unrelated to the Simmons killing and had "coerced" and "pressured" him into signing the statement implicating Byrd and Dean. Bush claimed that the detectives threatened to charge him with the Simmons homicide and "told [him] what to say." Bush maintained that he was "high on crack cocaine" at the time of his arrest, that he had "no first hand knowledge of [the] homicide," and that he "did not see [Dean] with any weapons," or hear Dean admit to "anything about [the] crime." In a separate affidavit, Bush directly repudiated any statements he made inculpating Byrd in the death of Simmons.
But that was not the last word the jury heard about Bush's statement to the detectives. Detective Frank LaBelle of the Mercer County Prosecutor's Office testified that, before trial, Bush confessed that he had fabricated the statements given to the defense. Bush explained to Detective LaBelle that he was "pissed off" at the investigating detectives because he felt they had not given him "a fair shake in an unrelated matter," and because Bush's codefendants in that other case apparently "made out a little better than he did."
The jury also learned about Bush's prodigious criminal past. Bush was convicted of a fourth-degree sexual offense in 1986, of third-degree possession of cocaine and second-degree robbery in 1988, of fourth-degree aggravated assault with a weapon in 1996, and of third-degree possession of a weapon for an unlawful purpose in 2001. Moreover, according to the testimony of Kenneth McNeil, a week before Simmons was killed, he, Dean, and Bush had robbed Simmons in his apartment house, taking from him a quantity of cocaine. During the robbery, Bush wielded a shotgunthe same shotgun that Byrd later used in the ill-fated robbery attempt that resulted in Simmons's death. McNeil testified that not only had he, Dean, and Bush robbed Simmons, but the very same day they attempted to rob him again. However, their efforts were thwarted because no one responded to the ringing of Simmons's doorbell.

C.
Bush's hearsay statements were read to the jury only after Bush refused to testify at defendants' trial and the court concluded at an ex parte hearing that defendants' threatening and intimidating conduct had rendered Bush unavailable as a witness. We now turn to the events leading up to the ex parte hearing, the hearing itself, and the court's reasons for admitting Bush's out-of-court statement to the police.
At the time of defendants' trial, Bush was serving an eight-year prison sentence with a three-year parole disqualifier for possessing a weapon for an unlawful purpose. While serving that sentence, Bush had been incarcerated in the same correctional facility and placed on the same tier where Byrd and Dean were housed. The prosecutor and Detective LaBelle had visited Bush there and expected his cooperation in the prosecution of Byrd and Dean. However, when Bush was brought to the Mercer County Courthouse and placed on the stand, he refused to take the oath or testify. Bush explained that he had made it known to the prosecutor that he had been put in "situations" that endangered both him and his family. Specifically, he complained that he had been incarcerated with the very defendants against *291 whom he would be offering testimony. The prosecutor also brought to the court's attention that Bush had been transported in a van with Byrd from state prison for defendants' trial.
The trial court acknowledged the "screw-ups" that resulted in a key State's witness being housed with defendants, but also reviewed pragmatically the limited options. At the time of trial, Bush already had served three years of his sentence, and the parole board had given Bush a future parole eligibility date of eighteen months. The court did not believe it likely that either civil or criminal contempt would have the coercive effect of compelling Bush to testify.[3]
Later in the trial, the prosecutor advised the court that Bush "wants to speak with your Honor regarding the threats that were put upon him by Freddie Dean and Dionte Byrd." The prosecutor also argued that defendants had forfeited their confrontation rights by making Bush unavailable as a witness and that Bush's statement inculpating defendants should be read to the jury.
Over the strenuous objections of defense counsel, the court questioned Bush in camera, on the record, out of the presence of defendants, their attorneys, and the prosecutor. Bush was brought into the court's chambers and, at the court's urging, his handcuffs were removed. Present in chambers, in addition to the judge and Bush, were three law enforcement officers, the judge's law clerk, and the court reporter. At no point was Bush placed under oath. The court and Bush engaged in a colloquy. Bush introduced himself as Alim Sprull, noting that his birth name was Kenneth Bush.
In response to questioning by the court, Bush acknowledged that the statement he gave to the police after Simmons's shooting was truthful. He stated that he refused to testify in court the previous week because "the police have put me in positions where I was locked up with both defendants at one time or the other, and then it happened again coming to court." Bush related that three years earlier he had been placed on the same tier with Byrd, who offered to have him bailed out if he changed his testimony. As a result of that encounter, Bush felt fearful.
Three or four weeks after that incident, Dean was transferred to Bush's tier. At some point, Dean learned about Bush's statement to the police and began to make what Bush construed to be indirect threats to him. Dean "kept pressuring" Bush to repudiate his statement to police, and in order to "keep peace" between the two, Bush signed the affidavit exculpating Dean. With an inmate's sense of realpolitik, Bush noted, "I can't stay on the same tier and then constantly tell the man I'm going against him." Bush also recanted his statement because he was "pissed off" *292 that the investigating detectives had not carried through on their promise to transfer him to a different prison tier, leaving him with no choice but to "do what [he] had to do" to protect himself.
At the time Bush signed the affidavit for Dean's defense, Byrd had been transferred to another correctional facility. Sometime at the end of 2002 or beginning of 2003, Byrd's younger brother, who was "locked up" on Bush's tier, showed Bush a letter that suggested that "[s]omebody [could] get at [him] at any time." After seeing the letter, Bush considered his physical safety threatened. Moreover, in the summer of 2003, Bush received a letter from Dean that left him with the overall impression that "anyone" who testified against Dean "could be dealt with."
When Bush was brought to the courthouse for a pre-trial hearing, Byrd and Dean soon learned that he was there to testify for the prosecution, not the defense. Afterwards, Bush's wife, who was Dean's cousin, received an inquiry from another cousin about whether she knew the reason for Bush's appearance in the courthouse. On one occasion, Bush was transported to the courthouse in the same van as Byrd, and although no threats were directed at Bush, the situation was "tense." On yet another occasion, Bush was placed in a cell across from Dean, who asked "lots of questions [about] what was going on," prompting Bush to reply, "I'm not going to do anything."
In light of those cumulative occurrences, Bush told the court that he believed that his safety and the safety of his wife and thirteen-year-old stepson would be endangered if he testified as a prosecution witness. He stated that he was willing to speak with the attorneys for Byrd and Dean, but would not testify against them for fear of retribution against him and his family.
The next day, counsel for defendants stated their objections to the ex parte, in camera hearing, arguing that the proceeding contravened their clients' due process and confrontation rights as well as their right to present evidence controverting Bush's assertions. Defense counsel maintained that the court had questioned Bush through leading questions and that the suspension of the adversarial process at the in camera hearing left Bush's unsworn testimony and credibility unchallenged. In particular, counsel claimed that they were denied the opportunity to subpoena the production of prison records or testimony of inmates and corrections officers to contradict Bush's damning accusations.
Although the trial court conceded that the in camera hearing was a "strange and novel proceeding" to address circumstances it had never encountered before, it rejected the arguments presented by the defense. The court was "clearly convinced" that Bush was "in fear for himself and for members of his family" as a result of defendants' conduct. The court found that the methods employed by defendants to deliver their message may have been subtle, but that the message had the "extraordinary... capacity to intimidate." The court concluded that, from its first-hand observations of Bush, "fear prevents and has prevented and will continue to prevent [his] testimony." On the basis of the doctrine of forfeiture by wrongdoing, articulated in federal cases and State v. Sheppard, 197 N.J.Super. 411, 484 A.2d 1330 (Law Div.1984), the court determined that because defendants' threatening conduct made Bush unavailable as a witness, defendants had waived any objection to the admission of Bush's statement to the police. The court then heard testimony from the detective who took Bush's statement implicating defendants, determined that the statement was given under circumstances *293 establishing its reliability, and permitted it and other contradictory and affirming statements made by Bush to be read to the jury.

D.
The Appellate Division held that the trial court erred in admitting Bush's hearsay statement inculpating defendants, and therefore reversed their convictions and remanded for a new trial. State v. Byrd, 393 N.J.Super. 218, 221, 235, 923 A.2d 242 (App.Div.2007). The panel observed that unlike the Federal Rules of Evidence, the New Jersey Rules of Evidence have no forfeiture-by-wrongdoing exception to the hearsay rule. Id. at 232-34, 923 A.2d 242 (comparing Fed.R.Evid. 804(b)(6) with N.J.R.E. 804(b)). More particularly, N.J.R.E. 804(b) does not contain a provision that allows for the admission of a hearsay statement inculpating a defendant when the witness is rendered unavailable to testify due to the threatening or violent conduct of the defendant. Id. at 232-33, 923 A.2d 242.
The panel noted that since the promulgation of Federal Rule of Evidence 804(b)(6) in 1997, the highest courts in a number of states that did not have a codified forfeiture-by-wrongdoing hearsay exception in their evidence rules "adopted the forfeiture doctrine through judicial decision." Id. at 233, 923 A.2d 242 (collecting citations). Nonetheless, the panel concluded that "given the significant and farreaching implications" of the adoption of a similar hearsay exception in this State, "such a change in the Rules of Evidence should be accomplished by our Supreme Court in accordance with the procedure prescribed in N.J.S.A. 2A:84A-38 and -39, rather than by judicial opinion." Id. at 234, 923 A.2d 242 (citing State v. Guenther, 181 N.J. 129, 160, 854 A.2d 308 (2004)). Accordingly, the panel found that our evidence rules barred the introduction of Bush's highly incriminating out-of-court-statement. Id. at 234-35, 923 A.2d 242. In addition, the Appellate Division determined that the trial court's "ex parte procedure," taking Bush's testimony outside the presence of defense counsel, "was at variance with the full evidentiary hearings conducted ... in forfeiture-by-wrongdoing cases." Id. at 232, 923 A.2d 242. For those reasons, a new trial was ordered. Id. at 235, 923 A.2d 242.
We granted the State's petition for certification, 194 N.J. 445, 945 A.2d 1288 (2008). We also granted the motion of the Association of Criminal Defense Lawyers of New Jersey to participate as amicus curiae.

II.
The State urges this Court to adopt a forfeiture-by-wrongdoing rule, similar to the one codified in the Federal Rules of Evidence and accepted by a majority of state court jurisdictions. The State argues that, as a matter of public policy and equity, a defendant who silences a witness through violence or intimidation should be barred from objecting to the admission of the witness's out-of-court statements inculpating the defendant. The State believes that widespread intimidation of witnesses poses the single greatest threat to the prosecution of cases involving gangs, organized crime, and domestic violence. Because the forfeiture-by-wrongdoing doctrine has been long embedded in the common law, according to the State, this Court should assert "its constitutional authority over the practice and procedure of the courts" pursuant to Article VI, Section 2, Paragraph 3 of the New Jersey Constitution, and unilaterally recognize this uncodified hearsay rule exception without resorting to the process for adopting new rules of evidence set forth in the Evidence Act, N.J.S.A. 2A:84A-33 to -44. The State also *294 maintains that the trial court acted properly in conducting an ex parte hearing and admitting Bush's statement to the police. Therefore, it submits that the Appellate Division should be reversed.
Defendants would affirm the Appellate Division. They submit that despite the common law antecedents of the forfeiture-by-wrongdoing hearsay exception, the doctrine was never codified in our evidence rules and therefore the trial court erred in admitting Bush's statement. Defendants reason that to follow the course proposed by the State would fundamentally alter our evidence rules "solely by judicial decision" in a manner inconsistent with the Evidence Act. That Act, defendants insist, contemplates that any significant change to our evidence rules come about through the collaboration of all three branches of government. (Citing State v. D.R., 109 N.J. 348, 352, 537 A.2d 667 (1988)). Whatever course this Court takes, defendants maintain that any new rule of evidence should not be retroactively applied to their concluded trials. They also take issue with the ex parte procedure that led to the court's admission of Bush's statement inculpating them. Defendant Byrd points out that the trial court "found forfeiture by wrongdoing based solely on the almost uncorroborated word of an accomplice and co-conspirator ... after an in camera hearing from which counsel were excluded," thus denying defendants the opportunity "to cross-examine the allegedly intimidated witness or to present their own evidence casting doubt on his vague assertions."
Amicus curiae Association of Criminal Defense Lawyers of New Jersey contends that the adoption of the forfeiture-by-wrongdoing doctrine would constitute a "new exception to the hearsay rule and a significant change to the existing rules of evidence." The amicus asserts that this Court's constitutional rule-making authority is limited in such circumstances and that the Court should invoke the statutory procedures established in the Evidence Act, one of which is to submit a proposed rule for adoption by the Judicial Conference.

III.

A.
Whether a non-testifying witness's out-of-court statement inculpating a defendant should be admitted into evidence under the forfeiture-by-wrongdoing doctrine is a matter of first impression in our State.[4] Unlike many other jurisdictions, New Jersey's Rules of Evidence do not contain a forfeiture-by-wrongdoing exception to the hearsay rule.[5] Therefore, we first begin with a historical overview of the common law doctrine of forfeiture by wrongdoing and the public policy that gave rise to the *295 doctrine. Second, we examine the doctrine's relevance to the particular needs of this State's criminal justice system. We then look to whether a forfeiture-by-wrongdoing hearsay exception should be adopted by judicial decisionmaking or by the procedures set forth in the Evidence Act. Last, we outline the procedures that must be followed before any out-of-court statement can be admitted into evidence pursuant to the forfeiture-by-wrongdoing doctrine.

B.
In 1997, the Federal Rules of Evidence codified the common law doctrine of forfeiture by wrongdoing. See Fed. R.Evid. 804(b)(6). Under that doctrine, the hearsay statement of a witness is admissible if the defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed.R.Evid. 804(b)(6). Most recently, in Giles v. California, Justice Scalia traced the common law origins of the forfeiture-by-wrongdoing doctrine, which dates back to seventeenth-century English common law. 554 U.S. ___, ___, 128 S.Ct. 2678, 2682-91, 171 L.Ed.2d 488, 494-504 (2008). The common law "rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." Reynolds v. United States, 98 U.S. 145, 159, 25 L.Ed. 244, 248 (1879). Simply put, the purpose of the common law forfeiture rule was to "remov[e] the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against themin other words, it is grounded in `the ability of courts to protect the integrity of their proceedings.'" Giles, supra, 554 U.S. at ___, 128 S.Ct. at 2691, 171 L.Ed.2d at 504 (quoting Davis v. Washington, 547 U.S. 813, 834, 126 S.Ct. 2266, 2280, 165 L.Ed.2d 224, 244 (2006)).
Thus, the forfeiture-by-wrongdoing doctrine is founded on three significant public policy rationales. The first is to remove any profit that a defendant might receive from his own wrongdoing. See Reynolds, supra, 98 U.S. at 159, 25 L.Ed. at 248; United States v. Gray, 405 F.3d 227, 242 (4th Cir.) ("[F]ederal courts have recognized that the forfeiture-by-wrongdoing exception is necessary to prevent wrongdoers from profiting by their misconduct."), cert. denied, 546 U.S. 912, 126 S.Ct. 275, 163 L.Ed.2d 245 (2005). The second rationale is to provide a strong deterrent against intimidation and violence directed at witnesses by defendants attempting to game the judicial system. See Giles, supra, 554 U.S. at ___, 128 S.Ct. at 2691, 171 L.Ed.2d at 504; United States v. Thompson, 286 F.3d 950, 962 (7th Cir. 2002) ("The primary reasoning behind this rule is obviousto deter criminals from intimidating or `taking care of' potential witnesses against them."), cert. denied, 537 U.S. 1134, 123 S.Ct 918, 154 L.Ed.2d 824 (2003). A defendant calculating whether to contrive to make a witness unavailable may find that his trial prospects are far worse off by the admission of an unimpeachable out-of-court statement inculpating him than by the testimony of a live witness subject to cross-examination. Last, the forfeiture-by-wrongdoing doctrine "furthers the truth-seeking function of the adversary process, allowing fact finders access to valuable evidence no longer available through live testimony." Commonwealth v. Edwards, 444 Mass. 526, 830 N.E.2d 158, 167 (2005).
The forfeiture-by-wrongdoing doctrine is applied not only in our federal courts, but also in the courts of most of our sister states and the District of Columbia.[6] No *296 court that has considered the forfeiture-by-wrongdoing doctrine has rejected it. See Edwards, supra, 830 N.E.2d at 166-67 ("[W]e are aware of no jurisdiction that, after considering the [forfeiture-by-wrongdoing] doctrine, has rejected it."); Devonshire v. United States, 691 A.2d 165, 168 (D.C.) (noting "[a]ll federal and state courts that have addressed this issue, that we could find, have" accepted forfeiture-by-wrongdoing doctrine), cert. denied, 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997).
Significantly, the admission of evidence under the forfeiture-by-wrongdoing doctrine does not offend the Sixth Amendment to the United States Constitution, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[7]U.S. Const. amend. VI. That is so because the forfeiture-by-wrongdoing rule "extinguishes confrontation claims on essentially equitable grounds." Crawford v. Washington, 541 U.S. 36, 62, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177, 199 (2004).
In Reynolds, the United States Supreme Court declared that "[t]he Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." 98 U.S. at 158, 25 L.Ed. at 247. More recently, the Court explained in Davis v. Washington that
when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.
[547 U.S. 813, 833, 126 S.Ct. 2266, 2280, 165 L.Ed.2d 224, 244 (2006).]
In short, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." Ibid. The Sixth Amendment, however, requires that the wrongdoer have as his intent "the particular purpose of making the witness unavailable" to testify at trial. Giles, supra, 554 U.S. at ___, 128 S.Ct. at 2687, 171 L.Ed.2d at 500 (citations and internal quotation marks omitted).
Accordingly, the forfeiture-by-wrongdoing doctrine is grounded in common sense, supported by public policy, and does not run afoul of the federal Confrontation Clause. We next examine the doctrine's relevance to the particular needs and jurisprudence *297 of our State's criminal justice system.

C.
In certain types of criminal cases, witness intimidation appears to be nothing short of a nationwide pandemic. Although "[e]mpirical data on witness intimidation" may be difficult to gather (successful intimidation seldom comes to the attention of law enforcement), "anecdotal evidence is plentiful." Brendan O'Flaherty & Rajiv Sethi, Witness Intimidation 2 (Columbia Univ. Dep't of Econ., Discussion Paper No. 0708-07, Oct. 2007), available at http://www.columbia.edu/cu/economics/discpapr/DP0708-07.pdf. Nationally, prosecutors estimate that witness intimidation occurs in seventy-five to one hundred percent of violent crimes committed in some gang-dominated neighborhoods. H.R.Rep. No. 110-113, at 49 (2007). According to the 2000 National Youth Gang Survey, gang-related witness intimidation is so widespread that "82 percent of the police agencies responding to the ... survey indicated that measures were being taken to deal with the problem." John Anderson, Gang-Related Witness Intimidation, Nat'l Gang Center Bull. (Nat'l Gang Ctr., Wash., D.C.), Feb. 2007, at 1.
Witness intimidation is no stranger to New Jersey. Threats to witnesses, the killing of witnesses, and the climate of fear that prevails in some crime-infested neighborhoods have undermined law enforcement's ability to prosecute even murder cases. See, e.g., David Kocieniewski, With Witnesses at Risk, Murder Suspects Go Free, N.Y. Times, Mar. 1, 2007, at A1 (documenting witness intimidation in New Jersey in eight-part series called "Scared Silent"); William Kleinknecht & Jonathan Schuppe, Getting Away with Murder, Star-Ledger (Newark, N.J.), Jan. 29, 2006, at 1 (noting that from 1998 through 2003, dozens of witnesses either recanted, disappeared, or were killed). In certain cities, the expectation of retribution against those who cooperate with the police has given rise to the urban proverb that "[s]nitches wear stitches." David Kocieniewski, In Prosecution of Gang, a Chilling Adversary: The Code of the Streets, N.Y. Times, Sept. 19, 2007, at B1; see also Nat'l Ctr. for Victims of Crime, Snitches Get Stitches: Youth, Gangs, and Witness Intimidation in Massachusetts 5 (2007) (documenting "`no-snitching'" code among urban youth in Massachusetts).
In some crime-ridden communities, it is understood that breaking the street code of silence may lead to a brutal beating, maiming, or death. Kleinknecht & Schuppe, supra, at 1 (noting that at least five witnesses to murders were killed in 2004 and 2005). Indeed, fear of retaliation from gangs can be so overwhelming that some persons will refuse to come forward even when a family member is victimized or the safety of the neighborhood is imperiled. David Kocieniewski, A Little Girl Shot, and a Crowd that Didn't See, N.Y. Times, July 8, 2007, at A1 (noting that murder charges were dropped against two gang members because none of twenty people in sight of killings willing to testify).
From our review of countless petitions for certification, we can take judicial notice of the all too typical scenariowitnesses to a violent or drug crime give signed or tape-recorded statements to the police at the commencement of an investigation, only to recant their statements or have memory failure at the time of trial. The persistent problem of witness intimidation in New Jersey cannot be denied. Adoption of a forfeiture-by-wrongdoing exception to the hearsay rule is not a panacea, but is a reasonable step that our *298 criminal justice system can take to address the problem.
We therefore conclude that New Jersey should join the ranks of the many other jurisdictions that have amended their rules of evidence to embrace the forfeiture-by-wrongdoing doctrine. We also find that our State Constitution's Confrontation Clause gives no more quarter than the Sixth Amendment to those who would silence a witness from testifying at a trial. Accordingly, if a defendant attempts "to undermine the judicial process by procuring or coercing silence from witnesses and victims," Davis, supra, 547 U.S. at 833, 126 S.Ct. at 2280, 165 L.Ed.2d at 244, his confrontation rights under Article I, Paragraph 10 of our State Constitution will be extinguished on equitable grounds.
We now must determine the appropriate means by which to make the forfeiture-by-wrongdoing doctrine a part of our Rules of Evidence. The State encourages us to act unilaterally whereas defendants and amicus propose that we follow the procedures set forth in the Evidence Act.

D.
In New Jersey, the adoption of evidence rules is governed by statutethe Evidence Act, 1960, N.J.S.A. 2A:84A-33 to -44and the process of adopting such rules involves all three branches of government. In accordance with the procedures of the Evidence Act, "[t]he Supreme Court may adopt rules dealing with the admission or rejection of evidence," N.J.S.A. 2A:84A-33, but those procedures require participation by the Legislature and Governor, see N.J.S.A. 2A:84A-34 to -39.
The Evidence Act provides two different paths to the adoption of new evidence rules. One path allows for a Judicial Conference, which includes judges, lawyers, and academics, to consider a draft of new evidence rules. See N.J.S.A. 2A:84A-34. On recommendation of the Conference, and approval by the Supreme Court, the proposed new evidence rules would be announced "on September 15 next following such Judicial Conference," and then filed with the Legislature and the Governor. See N.J.S.A. 2A:84A-35. Under that approach, unless rejected by a joint resolution "adopted by the Senate and General Assembly and signed by the Governor," the proposed evidence rules "take effect on July 1 next following." N.J.S.A. 2A:84A-36. It is through this process that the 1967 and current 1993 Rules of Evidence, N.J.R.E. 101 to 1103, were adopted. See Busik v. Levine, 63 N.J. 351, 367-68, 307 A.2d 571 ("The [1967] rules of evidence were adopted cooperatively by the three branches of government under the Evidence Act, 1960...."), appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973); Supreme Court Order dated September 15, 1992 (adopting New Jersey Rules of Evidence, N.J.R.E. 101 to 1103, pursuant to provisions of N.J.S.A. 2A:84A-36, effective July 1, 1993).
The other path for the adoption of evidence rules permits the Supreme Court, at any time and without presentation to a Judicial Conference, to submit the proposed rules to the Senate and General Assembly, for their approval by joint resolution, and to the Governor for his signature. See N.J.S.A. 2A:84A-38; see also State v. D.R., 109 N.J. 348, 375, 537 A.2d 667 (1988) (setting forth procedure). The scheme for the adoption of our evidence rules has historical antecedents that date back to the ratification of the 1947 Constitution.
Before passage of the Evidence Act, the various branches of government made competing constitutional claims as to which branch had authority to enact and regulate evidence rules. See D.R., supra, 109 N.J. *299 at 373-75, 537 A.2d 667; Busik, supra, 63 N.J. at 367-68, 307 A.2d 571. Although Article VI, Section 2, Paragraph 3 of the New Jersey Constitution granted the Supreme Court plenary authority over procedural rules governing our courts,[8]Winberry v. Salisbury, 5 N.J. 240, 245-46, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), the delegates to the 1947 Constitutional Convention were either unable or unwilling to classify rules of evidence as either procedural rules or substantive law.[9] Indeed, there was considerable support for the position that evidence rules contain elements of both. See Busik, supra, 63 N.J. at 367, 307 A.2d 571 (noting that evidence rules contain elements of both "`procedural'" and "`substantive'" law).
Interestingly, the 1942 draft of the proposed State Constitution empowered the Supreme Court to "make rules as to the administration of all of the courts, and, subject to law, as to pleading, practice and evidence in all courts." 4 Proceedings of the Constitutional Convention of 1947, at 561 (reprinting text of 1942 "Proposed Revised Constitution") (emphasis added). The 1944 draft Constitution similarly authorized, but in different language, the Supreme Court to make rules governing evidence. Id. at 566 (reprinting text of "Proposed Revised Constitution of 1944"). The language in the 1942 and 1944 draft Constitutions giving the Supreme Court exclusive authority to adopt rules of evidence fell out of the final draft of the 1947 Constitution. This history suggests that delegates to the Constitutional Convention decided not to resolve the thorny question concerning whether the Supreme Court had exclusive rule-making power to enact evidence rules.
The Evidence Act was a "pragmatic resolution" among the three branches of government, giving each branch a role in the process of enacting rules of evidence. D.R., supra, 109 N.J. at 373-74, 537 A.2d 667. In averting a conflict with the other branches of government, "we did not pursue to a deadlock the question whether `evidence' was `procedural' [rather than substantive] and therefore ... the sole province of the Supreme Court." Busik, supra, 63 N.J. at 368, 307 A.2d 571.
The New Jersey Rules of Evidence are a codification of many common law rules but not necessarily all common law rules *300 that governed classes of evidence admissible in our courts and the procedures for introducing such evidence. Our codified evidence rules place both the bench and the bar on notice of the fundamental framework for the admission of evidence during a trial. See Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 102 (2008) ("New Jersey's Rules of Evidence provide a comprehensive and coherent structure designed to provide specific instruction to the bench and bar in the vast array of evidentiary contexts that may arise in contested trials."). In recent history, we have adopted evidence rules that dramatically impact the conduct of trials by way of the Evidence Act, D.R., supra, 109 N.J. at 352, 375-76, 537 A.2d 667, while allowing evidence rule changes of lesser consequence to be developed through case law, State v. Guenther, 181 N.J. 129, 159-60, 854 A.2d 308 (2004).
Although the State and our concurring colleagues correctly point out that other jurisdictions have adopted a forfeiture-by-wrongdoing rule by judicial decisionmaking, they fail to take sufficient note of the fact that New Jersey's evidence rules, and the process by which we adopt those rules, are different from those of other states. For example, unlike New Jersey, a number of jurisdictions, including the federal system, have catch-all or residual exceptions to their hearsay rules that give their courts greater leeway to recognize evidentiary rules that are not codified.[10]See State v. Brown, 170 N.J. 138, 152, 784 A.2d 1244 (2001) (stating that "New Jersey has expressly declined to adopt the federal residual hearsay exception"). Before adoption of the federal forfeiture-by-wrongdoing rule, Fed.R.Evid. 804(b)(6), in 1997, some federal courts relied on the residual exception of the federal hearsay rule to justify the application of the forfeiture doctrine. See, e.g., United States v. Rouco, 765 F.2d 983, 993-95 (11th Cir. 1985) (admitting hearsay statement of witness killed by defendant pursuant to federal residual hearsay exceptions), cert. denied, 475 U.S. 1124, 106 S.Ct 1646, 90 L.Ed.2d 190 (1986); United States v. Carlson, 547 F.2d 1346, 1353-55 (8th Cir.1976) (admitting, pursuant to federal residual hearsay exception, hearsay statement of witness who refused to testify due to defendant's threats), cert. denied, 431 U.S. 914, 97 S.Ct 2174, 53 L.Ed.2d 224 (1977).
Likewise, some state courts also adopted the forfeiture-by-wrongdoing rule through catch-all exceptions to their hearsay rules. See, e.g., Vasquez v. People, 173 P.3d 1099, 1106 (Colo.2007) ("The fact that the defendant has forfeited his confrontation rights by wrongdoing does not render the evidence reliable.... [T]he reliability of the evidence must still be ensured according to the standards of the Colorado *301 Rules of Evidence [and its residual hearsay exception]."); Boyd v. State, 866 N.E.2d 855, 857 (Ind.Ct.App.) ("Although the Indiana Rules of Evidence do not contain a similar provision [analogous to Federal Rule of Evidence 804(b)(6)], we see no reason why the doctrine of forfeiture by wrongdoing may not be applied as a matter of common law" in accordance with Indiana Rule of Evidence 101(a), permitting common law evidence rules.), trans. denied, 878 N.E.2d 208 (Ind.2007); State v. Henry, 76 Conn.App. 515, 820 A.2d 1076, 1090 (relying on "`savings clause,'" Conn.Code Evid. § 1-2(b), to admit victim's hearsay statements pursuant to forfeiture-by-wrongdoing doctrine), appeal denied, 264 Conn. 908, 826 A.2d 178 (2003); State v. Valencia, 186 Ariz. 493, 924 P.2d 497, 501-05 (App.1996) (admitting hearsay statements of victim killed by defendant, in part, on basis of residual hearsay exception).
Notably, a number of states have enacted by statute the forfeiture-by-wrongdoing rule. See, e.g., Cal. Evid.Code Ann. § 1350; Del. R. Evid. 804(b)(6); Haw. R. Evid. 804(b)(7); 725 Ill. Comp. Stat. 5/115-10.2(d); Ky. R. Evid. 804(b)(5); Md. Cts. & Jud. Proc.Code Ann. § 10-901; Mich. R. Evid. 804(b)(6); N.D. R. Evid. 804(b)(6); Ohio R. Evid. 804(B)(6); Or. Rev.Stat. § 40.465(f); Pa. R. Evid. 804(b)(6); Tenn. R. Evid. 804(b)(6); Vt. R. Evid. 804(b)(6).
Thus, the method by which a state or court has adopted the forfeiture rule depends on the unique laws of the particular jurisdiction. It is understood that our evidentiary laws cannot remain static and that they must adapt to dynamic forces and changing realities in the legal profession and society. In that respect, N.J.R.E. 102 provides that "[t]he adoption of these rules shall not bar the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."
Although we believe that the addition of a forfeiture-by-wrongdoing hearsay exception to our evidence rules would be a positive development and promote the ascertainment of truth, we cannot accept the State's argument that this Court should act unilaterally and bypass the procedures of the Evidence Act. The present case is in many ways comparable to the circumstances presented in State v. D.R. The State urged the Court in D.R. to do an end run around the Evidence Act and adopt by judicial decree the "tender years" hearsay exception, which would permit admissibility of a child-victim's out-of-court statements, even in cases in which the child did not testify. 109 N.J. at 351-52, 537 A.2d 667; see also N.J.R.E. 803(c)(27) (current "tender years" exception). We rejected that approach. D.R., supra, 109 N.J. at 375-76, 537 A.2d 667. Despite our support for the adoption of the "tender years" hearsay exception, we determined that "adoption of such a rule by judicial decision [was] inappropriate" in light of "the serious and far-reaching nature" of the change to our evidence rules. Ibid. We declined "to probe the outer limits of the judiciary's power to modify or adopt rules of evidence," id. at 375, 537 A.2d 667, and instead, we decided, as a matter of comity, that "a fundamental change in the hearsay rule solely by judicial decision is inconsistent with the procedure set forth in the Evidence Act, 1960," id. at 352, 537 A.2d 667.
The present case, moreover, is not similar to State v. Guenther, in which we merely modified the scope of an existing evidence rule, N.J.R.E. 608, allowing in very narrow circumstances the use of a prior false criminal accusation to impeach the credibility of a victim-witness in a criminal case. 181 N.J. at 154, 160, 854 *302 A.2d 308. In that case, whether to permit impeachment of a witness with a prior false criminal accusation raised a significant constitutional issue concerning the scope of a criminal defendant's right of confrontation. Id. at 154, 854 A.2d 308. We emphasized in Guenther that "we [were] not creating a new rule of evidence," id. at 159, 854 A.2d 308, and reiterated what we said in D.R.  that "significant changes to the Rules of Evidence `should be adopted in accordance with the prescribed statutory procedure.'" Id. at 160, 854 A.2d 308 (quoting D.R., supra, 109 N.J. at 352, 375-76, 537 A.2d 667). Even though we acted alone in modifying in a limited fashion N.J.R.E. 608, we referred to this Court's Committee on the Rules of Evidence the issue of whether there should be "wider application in other circumstances" of impeaching a witness who had made prior false accusations.[11]Ibid.
As in D.R., the adoption of a forfeiture-by-wrongdoing exception in this case would render "a fundamental change in the hearsay rule," one with "serious and far-reaching" consequences. D.R., supra, 109 N.J. at 352, 375, 537 A.2d 667. If the Evidence Act did not apply here, it is difficult to imagine a case in which it would. Accordingly, we will adhere to the procedural requirements of the Evidence Act, and take the second path  previously described  for adoption of a new evidence rule. In accordance with the Act, we will submit the proposed rule to the Senate and the General Assembly for their approval by resolution, and to the Governor for his signature. See N.J.S.A. 2A:84A-38. That route, we believe, will allow for a more expeditious adoption of the proposed forfeiture-by-wrongdoing rule. The hearsay exception to our evidence rules that we propose will allow for the admission of a witness's statement offered against a party who has engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the witness.[12] Because of the good the new rule will do in combating witness intimidation and ensuring the integrity of court proceedings, we ask that the Legislature and Governor act as soon as possible to adopt a forfeiture-by-wrongdoing hearsay exception.
In the event the Senate and the General Assembly issue a joint resolution, signed by the Governor, the proposed forfeiture-by-wrongdoing exception shall take effect and become part of the Rules of Evidence. See N.J.S.A. 2A:84A-38.

E.
In the expectation that the Legislature and the Governor will act favorably on the proposed amendment to the Rules of Evidence, and to ensure fairness in the application of the forfeiture-by-wrongdoing hearsay exception, we now set forth the procedures that must be followed before the admission of such evidence. Although the forfeiture rule would apply to any party who wrongly procures the unavailability of a witness, for our purposes here, we will refer to the State as the party invoking the rule.
When the State intends to introduce a witness's statement through the *303 forfeiture-by-wrongdoing exception to the hearsay rule, it must make known its intention as soon as reasonably practicable. Ordinarily, the State should advise defense counsel and the court as soon as it becomes aware that the defendant's wrongful conduct has made the witness unavailable and that it intends to offer the witness's out-of-court statement into evidence. The State must reveal the identity of the witness and the particulars of the statement that will be offered into evidence.
Next, the trial court must conduct an N.J.R.E. 104(a) hearing, outside the presence of the jury, to determine whether the witness's out-of-court statement should be admitted into evidence because the defendant engaged in wrongful conduct, making the witness unavailable.[13]See, e.g., United States v. Dhinsa, 243 F.3d 635, 653 (2d Cir.) ("[P]rior to finding that a defendant waived his confrontation rights with respect to an out-of-court statement by an actual or potential witness admitted pursuant to Rule 804(b)(6), the district court must hold an evidentiary hearing outside the presence of the jury."), cert. denied, 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001); Commonwealth v. Paddy, 569 Pa. 47, 800 A.2d 294, 310 n. 10 (2002) ("[T]he prevailing federal view [is] that the [forfeiture-by-wrongdoing exception's] applicability is to be determined at an evidentiary hearing prior to the admission of the evidence in question.").
The hearing must be conducted in the presence of counsel and defendant, and the defendant can only be excluded from the hearing for extraordinary reasons that must be articulated on the record. See R. 3:16(b) ("The defendant shall be present at every stage of the trial...."); see also State v. W.A., 184 N.J. 45, 60, 875 A.2d 882 (2005) (holding that judge must state reasons on record if defendant is denied physical presence at voir dire sidebar of juror because of security concerns).
In those cases in which the witness is available to testify but refuses to do so, due to alleged threats or fear induced by the defendant, the court ordinarily should advise the witness of his obligation to testify and that if he refuses to do so, he will be held in contempt. A witness must know that there will be consequences if a court order is disobeyed. If the witness continues to refuse to testify after the threat of contempt, he will be deemed an unavailable witness.[14]See N.J.R.E. 804(a)(2) (stating that an "unavailable" witness, for purposes of hearsay exceptions detailed in N.J.R.E. 804, is one who "persists in refusing to testify concerning the subject matter of the [hearsay] statement despite an order of the court to do so"). A witness is also unavailable if the witness cannot be located, has been rendered unable to testify because of the infliction of physical or psychological injuries, or has been killed as a result of the wrongful conduct of the defendant. See Edwards, supra, 830 N.E.2d at 168-69 ("Without question, the doctrine should apply in cases where a defendant murders, threatens, or intimidates a witness in an effort to procure that witness's unavailability." (footnotes omitted)).
At the hearing, the State will bear the burden of proving by a preponderance *304 of the evidence that defendant engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the witness's unavailability. See id. at 172 ("We, like virtually all of the jurisdictions that have considered the issue, hold that the prosecution must prove by a preponderance of the evidence that the defendant procured the witness's unavailability."). Federal Rule of Evidence 804(b)(6) also applies a preponderance standard. See Fed.R.Evid. 804(b)(6) advisory committee's note ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior the new Rule 804(b)(6) seeks to discourage."). In other words, the State must demonstrate that the defendant by his wrongful conduct, directly or indirectly, caused the witness's unavailability  that is, caused the witness's physical absence or the witness's refusal or inability to testify.
Before admitting an out-of-court statement of a witness under the forfeiture-by-wrongdoing rule, the court must determine that the statement bears some indicia of reliability. The methodology that we apply in the case of recanting witnesses will work equally well in the case of witnesses made unavailable under the forfeiture rule. So, for example, when a State's witness testifies inconsistent with a prior statement that "(A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (B) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in a deposition," N.J.R.E. 803(a)(1), the prior statement is admissible "as substantive evidence provided its reliability has been established by a preponderance of the evidence in light of all surrounding relevant circumstances," State v. Gross, 121 N.J. 18, 29, 577 A.2d 814 (1990).
The same general approach should be taken in the case of the statement of a witness made unavailable by a defendant's wrongdoing. Thus, a witness's statement taken in the manner prescribed by N.J.R.E. 803(a)(1)(A) or (B), which is determined to be reliable in light of all the surrounding circumstances, will be admissible as substantive evidence if the State establishes that the defendant wrongfully procured the witness's unavailability. To allow for some flexibility to the wide range of scenarios that may involve a defendant using unlawful means to render a witness unavailable, in limited circumstances, an out-of-court statement may be admissible, even if not contained in a recording or writing, or if not given under oath, so long as the State demonstrates that the statement has compelling indicia of trustworthiness.
Those procedural prerequisites for the admissibility of a statement offered under the forfeiture rule will ensure that only reliable statements of witnesses, whose unavailability has been procured by a defendant's wrongdoing, are placed before the jury. We now apply the principles enunciated to the facts of this case.

IV.
We agree with the Appellate Division that, at the time of defendants' trial, no codified evidence rule or precedent in this State permitted the introduction of an out-of-court statement inculpating defendants by a non-testifying witness, even if defendants were responsible for making the witness unavailable to testify. See Byrd, supra, 393 N.J.Super. at 232-34, 923 A.2d 242. For the reasons stated earlier, we also agree that the trial court erred by adopting a forfeiture-by-wrongdoing evidence rule by judicial decisionmaking. However, even if a forfeiture-by-wrongdoing exception to the hearsay rule were on *305 the books when defendants were tried, we still would be constrained to reverse their convictions because the trial court admitted Kenneth Bush's damning hearsay statement after conducting an in camera hearing, which excluded defendants and their counsel in violation of their due process and confrontation rights.
Indeed, without any adequate showing of good cause, the court held an in camera hearing with a State's witness, who might have been considered an accomplice or co-conspirator to the crimes for which defendants stood trial. By his own account, Bush traveled with Byrd and Dean in the van to the victim's apartment, waiting in the van while defendants armed with a handgun and shotgun staged a failed robbery that led to the death of Charles Simmons. Along with defendants, Bush was in the van as it fled the scene of the crime. According to Kenneth McNeil, the week before Simmons's killing, Bush was armed with a shotgun and participated in a robbery of Simmons, and that same day, with others, attempted to rob Simmons yet again. In addition, Bush had an extensive criminal record and drug history and, when called to testify, was serving a prison term for possession of a weapon for an unlawful purpose. Bush, moreover, in affidavits provided to defense counsel had recanted his statement, given to the police, inculpating defendants.
With those facts as a backdrop, when the prosecutor advised the trial judge that Bush wanted to speak with him, Bush was brought to the court's chambers. Present were three law enforcement officers providing security, the trial judge, his law clerk, and the court reporter. Nothing in the record suggests that Bush would have refused to give testimony if defense counsel and the prosecutor were also present. In fact, Bush stated that he would be willing to speak with defense counsel later.
Before taking testimony from Bush, the court never required Bush to take an oath or make an affirmation to tell the truth subject to the penalty provided by law. See N.J.R.E. 603 ("Before testifying a witness shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by law."). The failure to place Bush under oath, alone, was reason enough to disregard his testimony. See State v. Caraballo, 330 N.J.Super. 545, 555, 750 A.2d 177 (App.Div.2000) (holding that defendant was deprived of fair trial, in part, because witnesses were required to testify even though they refused to take oath or make affirmation). The court, moreover, elicited a number of answers through leading questions, allowing Bush to describe what he considered to be direct and indirect threats from Byrd and Dean, which gave him reason to fear for his safety and the safety of his family.
The court made credibility determinations based on Bush's unsworn, unchallenged testimony in chambers. From the conclusions that it drew at the ex parte, in camera hearing, the court permitted the prosecution to introduce Bush's statement to the police implicating defendants in the robbery and killing of Simmons. From the defense perspective, Bush was far from the disinterested citizen, who steps forward for the good of the community to expose criminal misdeeds. Indeed, Bush, a self-confessed drug user with a string of criminal convictions, gave his statement to the police after he was arrested for a crime unrelated to Simmons's killing. Defense counsel wanted to expose his motives and test his recollection through cross-examination. Moreover, defense counsel claimed that they were denied the opportunity to present witnesses and evidence to rebut Bush's in camera assertions to the court.
*306 In our view, the in camera hearing represented a complete breakdown of the adversarial process. The court  not a recalcitrant witness, whatever his purported reasons for refusing to testify  must control the proceedings. Transferring a hearing from open court to chambers should not be a reason for suspending court rules or constitutional protections. Bush's unsworn and unchallenged testimony served as the foundational basis for the admission of, perhaps, the most devastating evidence offered against defendants. Both the federal and state constitutions guaranteed defendants the right to cross-examine Bush, and to introduce evidence contradicting and undermining Bush's version of the events. See State v. Garron, 177 N.J. 147, 168-69, 827 A.2d 243 (2003) (explaining that "[t]he Federal and New Jersey Constitutions guarantee criminal defendants a meaningful opportunity to present a complete defense," including "rights to confront, cross-examine, and produce witnesses" and "to elicit testimony favorable to the defense before the trier of fact" (citation and internal quotation marks omitted)), cert. denied, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004). In our system, a State's witness, particularly one with Bush's background, does not enter the courtroom as the presumptive truth-teller.
Proceedings in which the judge acts as the sole inquisitor are, with rare exception, foreign to our adversarial system. See United States v. Thompson, 827 F.2d 1254, 1258 (9th Cir.1987). The United States Court of Appeals for the Ninth Circuit in Thompson found unconstitutional an ex parte, in camera hearing in which the defendant and his counsel were excluded from observing or challenging the prosecution's reasons for exercising four of its peremptory challenges against potential African-American jurors. Id. at 1256, 1261. The circuit court concluded that "[a]bsent such compelling justification, ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process." Id. at 1258-59.
Likewise, in light of the constitutional right of confrontation, in State v. Ogburne, the Appellate Division held that a trial court erred by barring the defendant from an in camera Rape Shield hearing at which the alleged sexual assault victim testified about her sexual relations in close temporal proximity to the crime. 235 N.J.Super. 113, 117-19, 561 A.2d 667 (App. Div.1989); see also LaPointe v. State, 166 S.W.3d 287, 296-99 (Tex.Ct.App.2005) (excluding defendant and defense counsel from in camera Rape Shield hearing violated defendant's rights of confrontation and effective assistance of counsel). In Ogburne, despite defense counsel's presence at the hearing, the court found that defendant was denied a fundamental constitutional right. 235 N.J.Super. at 118-19, 561 A.2d 667.
It was wholly inappropriate to hold an ex parte, in camera hearing in the manner that occurred in this case. Even had the forfeiture-by-wrongdoing exception to the hearsay rule been codified in our evidence rules, we would be obliged to reverse defendants' convictions because of the fundamental procedural violations that occasioned the admission of Bush's out-of-court statement. We cannot say that the introduction of that statement, which was so central to the State's case, was harmless error. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result...."); State v. Ingram, 196 N.J. 23, 49, 951 A.2d 1000 (2008) ("[B]efore a ... constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a *307 reasonable doubt." (citation and internal quotation marks omitted)).
Last, the State has a responsibility to take reasonably prudent measures to protect the safety of its material witnesses. It bears mentioning that, whenever practicable, an imprisoned State's witness should not be placed on the same cell tier and in physical contact with the defendants against whom he will be offering testimony, or transported to court with one of those defendants, as apparently occurred in this case.

V.
For the reasons expressed, we affirm the judgment of the Appellate Division reversing defendants' convictions. We now forward to the Senate and General Assembly, for their approval by resolution, and to the Governor for his signature, a forfeiture-by-wrongdoing exception to the hearsay rule for inclusion in our Rules of Evidence.

Appendix A

Proposed New Exception to Hearsay Rule
N.J.R.E. 804(b)(8): Forfeiture-by-Wrongdoing
(8) Forfeiture-by-wrongdoing. A statement offered against a party who has engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.
Justice LaVECCHIA concurring.
I concur in the judgment of the Court that embraces the forfeiture-by-wrongdoing doctrine. I also concur fully in the judgment that the procedures employed by the trial court during defendants' trial were insufficient and cannot provide a basis for the admission of the pre-trial out-of-court statement of the allegedly intimidated witness who refused to take the stand. The trial court's ex parte proceedings in respect of the recalcitrant witness do not pass muster under any analysis. That said, I write separately to express my view that the trial court was not powerless to act in the face of what was transpiring on the eve of trial, namely a witness's sudden unavailability through his refusal to take the oath and to testify, which he attributed to defendants' wrongful conduct. I base that view on the common law's long-standing recognition of the forfeiture-by-wrongdoing doctrine.

I.
New Jersey's Constitution of 1947, art. XI, sec. I, par. 3. provides that "[a]ll law, statutory and otherwise, all rules and regulations of administrative bodies and all rules of courts in force at the time this Constitution or any Article thereof takes effect shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise." The State's earlier constitutions contained similar language.[1] Consistent with the earlier versions of the 1947 Constitution's language, the savings provision in the current article XI referencing "all law" has been interpreted to include the common *308 law. See State v. Culver, 23 N.J. 495, 503, 129 A.2d 715 (1957), cert. denied, 354 U.S. 925, 77 S. Ct. 1387, 1 L.Ed.2d 1441 (1957). Moreover, the term "otherwise" encompasses not only change by the legislative process but also by the "processes of change inherent in the common law." Ibid. As Chief Justice Vanderbilt said:
One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice.
[Id. at 505, 129 A.2d 715.]
When the 1776, 1844, and 1947 Constitutions were adopted, each incorporated into our law the extant common law. Thus, in 1947 with the adoption of our current Constitution, the judicial power included whatever equitable powers that the existing common law conferred on courts in respect of the forfeiture-by-wrongdoing doctrine.[2]
In 1879, the doctrine became expressly part of the common law of this nation, as recognized by the highest court of our country. See Reynolds v. United States, 98 U.S. 145, 158, 25 L.Ed. 244, 247 (1879). Following the equitable doctrine that had long-standing acceptance in England,[3] the Supreme Court held in Reynolds that, if the accused is responsible for a witness's unavailability, then he has forfeited his right to confront that witness. Ibid. "The Constitution does not guaranty an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege." Ibid.
Although the common law forfeiture-by-wrongdoing doctrine focused initially on a defendant's waiver of the constitutional right to confront a witness, as the doctrine evolved courts used it as support not only for bypassing a defendant's confrontation clause challenges, but also to support the admission of the unavailable witness's hearsay statements without having to resort to a separate hearsay exception. See, e.g., United States v. White, 116 F.3d 903, *309 912 (D.C.Cir.1997) (noting common trend of loss of both right to confront witness and to object based on hearsay); United States v. Houlihan, 92 F.3d 1271, 1282 (1st Cir.1996)(same); United States v. Mastrangelo, 693 F.2d 269, 272 (2d Cir. 1982)(same); United States v. Thevis, 665 F.2d 616, 633 (5th Cir.1982)(same). As the D.C. Circuit explained in White, supra, "[b]ecause both the hearsay rule and the confrontation clause are designed to protect against the dangers of using out-of-court declarations as proof, a defendant's actions that make it necessary for the government to resort to such proof should be construed as a forfeiture of the protections afforded under both." 116 F.3d at 912.
The common rationale in that decisional trend recognized that both bodies of law (confrontation rights and the hearsay rule) attempt to strike a balance between the government's need for probative evidence and the defendant's stake in testing the government's case through cross-examination. See Houlihan, supra, 92 F.3d at 1281 ("In constructing the balance the main interest that must be offset against the government's need for evidence is the accused's right to confrontation ... [o]nce the confrontation right is lifted from the scales by operation of the accused's waiver of that right, the balance tips sharply in favor of the need for evidence."). The United States Court of Appeals for the Fifth Circuit was the first to discuss in detail the interplay between the two principles:
Although the Supreme Court explicitly has held that the confrontation clause and the hearsay rule are not coterminous, the Court recently has stated that it is a "truism" that both provisions protect the same values. Both the confrontation clause and the hearsay rule seek to balance the need for relevant, probative evidence against the defendant's interest in testing the accuracy of evidence through personal confrontation and cross-examination. As noted by the Supreme Court in Mattox v. United States, 156 U.S. 237, 242-43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895), the confrontation clause envisions "a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."
Similarly, the hearsay rule envisions testimonial evidence given under the ideal conditions of a witness under oath, in the personal presence of the trier of fact, and subject to cross-examination. The reason that the hearsay rule and confrontation clause are not coterminous is not because the two provisions protect different interests, but because the two may balance the relevant interests differently. Thus a particular hearsay rule may admit evidence which offends confrontation rights because the rule favors the need for evidence and its probable reliability over the defendant's confrontational rights. Conversely, a particular hearsay rule may restrict evidence which nevertheless satisfies the confrontation clause because the rule favors increased protection for the defendant. In either case, however, the key interest offsetting the need for evidence is the defendant's interest in confrontation; if this interest is removed by a waiver of confrontation rights, the balance must necessarily fall in favor of the need for evidence. We hold, therefore, that under the circumstances of this case, [defendant's] waiver of his confrontation rights also acted as a waiver of the right *310 to raise a hearsay objection once the prosecution demonstrated a need for the evidence.
[Thevis, supra, 665 F.2d at 632-33 (internal citations and quotations omitted).]
The Thevis court clarified its holding, emphasizing that its decision would "not permit wholesale admission of hearsay evidence when a witness is unavailable." Id. at 633 n. 17. Thus, "[a] hearsay statement of a potential witness is admissible only if the government shows, by clear and convincing evidence that (1) the defendant caused the witness' unavailability (2) for the purpose of preventing that witness from testifying at trial." Ibid. It added that, even when the two-part test is met, the trial court should scrutinize the evidence and, if it "appears unreliable, its probative value may well be outweighed by the unfair prejudice resulting from unreliability and should be excluded under [Federal Rule of Evidence] 403." Ibid.
To be sure, other circuit courts addressing the hearsay aspect of an unavailable witness's evidence resulting from a defendant's wrongdoing have determined that the hearsay rules still applied and required application of an exception to admit the evidence. When the defendant caused the declarant's unavailability, the decisions in those circuits admitted the hearsay statements based on Federal Rule of Evidence 807.[4]See, e.g., United States v. Rouco, 765 F.2d 983, 994 (11th Cir.1985) (admitting testimony under Fed.R.Evid. 804(b)(5) and Fed.R.Evid. 803(24) which were combined and transferred to Fed.R.Evid. 807 with virtually same language); United States v. Carlson, 547 F.2d 1346, 1354 (8th Cir.1976) (same). That said, prior to the adoption of an explicit forfeiture-by-wrongdoing evidence rule in the Federal Rules of Evidence in 1997, every federal circuit court of appeals had adopted some form of the common law doctrine of forfeiture by wrongdoing, although differing on how the doctrine should be implemented in respect of the standard of proof necessary. Most required that the government show by a preponderance of the evidence that the defendant procured the witness's unavailability. See, e.g., United States v. Scott, 284 F.3d 758, 762 (7th Cir.2002); United States v. Dhinsa, 243 F.3d 635, 653-54 (2d Cir. 2001); United States v. Emery, 186 F.3d 921, 927 (8th Cir.1999); Houlihan, supra, 92 F.3d at 1280. Only the Fifth Circuit required that the government show by clear and convincing evidence that the defendant was responsible for the witness's absence. See Thevis, supra, 665 F.2d at 631. And, the circuits differed on whether the defendant forfeited only the right to confrontation or also forfeited the right to object to the evidence from the unavailable witness based on hearsay grounds.
In 1997, those differences evaporated when the doctrine of forfeiture by wrongdoing was codified by Federal Rule of Evidence 804(b)(6). Inserted in the evidence code as a hearsay exception, Rule 804(b) now provides that "the following are not excluded by the hearsay rule if the declarant is unavailable as a witness ... (6) Forfeiture by Wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."[5] A separate hearsay exception is no longer *311 necessary to admit an out-of-court statement by a witness made unavailable through a defendant's own wrongdoing. Instead a defendant's misconduct forfeits both his or her right to confront the witness and the right to object on hearsay grounds. The Rule does not require particularized indicia of reliability concerning the substance of the testimony.[6] It operates, as did the common law doctrine, on the recognition of "the need for a prophylactic rule to deal with abhorrent behavior `which strikes at the heart of the system of justice itself.'" Fed.R.Evid. 804(b)(6), advisory committee's note (quoting Mastrangelo, supra, 693 F.2d at 273). In reaffirming the now-codified common law doctrine, the Supreme Court's decision in Crawford v. Washington, accepts that this confrontation exception is in no way a means of assessing reliability. 541 U.S. 36, 62, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177, 199 (2004). Rather, "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability." Ibid. (citing Reynolds, supra, 98 U.S. at 158-159, 25 L.Ed. at 244). And, differences among the circuit courts about the need for an independent hearsay exception to admit forfeiture-by-wrongdoing evidence were resolved. The doctrine's codification in the federal rules extinguishes a defendant's objections to such evidence as hearsay.
Among the states, some version of the doctrine has been adopted in many jurisdictions. Those states have grappled with the same questions that, early on, plagued the circuit courts as to whether the doctrine would apply to both confrontation clause and hearsay objections.
In Commonwealth v. Edwards, the Massachusetts Supreme Judicial Court was presented with the question of whether forfeiture by wrongdoing would apply when the defendant colluded with a witness to ensure that the witness would not be heard at trial. 444 Mass. 526, 830 N.E.2d 158, 168-69 (2005). In deciding whether to adopt the common law doctrine, the court recognized the doctrine's widespread support in other states. Id. at 166-67. More importantly, it found that the forfeiture rule advances important public policy interests by ensuring that a wrongdoer does not profit by reason of his actions, and "furthers the truth-seeking function of the adversary process, allowing fact finders access to valuable evidence no longer available through live testimony." Id. at 167. The court then fixed the scope of the doctrine as it would be applied in its state: "[a] defendant forfeits, by virtue of wrongdoing, the right to object to the admission of an unavailable witness's out-of-court statements on both confrontation and hearsay grounds on findings that (1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to procure the witness's unavailability." Id. at 170. In so doing, the court acknowledged that denying a defendant the right to object on grounds of hearsay might present a situation where a statement was so lacking in reliability that its admission would raise due process concerns. Id. at 170 n. 21; see also United States v. Aguiar, *312 975 F.2d 45, 47 (2d Cir.1992) (recognizing that "the admission of facially unreliable hearsay would raise a due process issue" and stating that objection that probative value is outweighed by prejudicial effect is "not waived by procuring a witness's absence"). That possibility was not presented by the facts of the case, however, because the testimony admitted was taken before the grand jury under oath and, thus, the court found no due process problem with the admission of the testimony. Edwards, supra, 830 N.E.2d at 170 n. 21.
Similarly, in 2004, the Kansas Supreme Court reaffirmed its earlier holding in State v. Gettings, 244 Kan. 236, 769 P.2d 25 (1989), that a waiver of the right to confrontation, based on the wrongful absenting of a witness, also constitutes a waiver of any hearsay objections to the prior statements made by the absent witness. State v. Meeks, 277 Kan. 609, 88 P.3d 789, 794 (2004). The court adopted the reasoning of the Fifth Circuit in Thevis, that a waiver of the right to confrontation based upon the procurement of the absence of the witness also constitutes a waiver of any hearsay objections to prior statements of the absent witness. Ibid. The Kansas Court warned, however, that before a court determines that a defendant has waived his right to object on hearsay grounds, it must determine by a preponderance of the evidence that the accused brought about the unavailability. Ibid. Thus, in Meeks, the Kansas Supreme Court found that the witness's statements had been properly admitted despite the defendant's argument that they lacked any adequate indicia of reliability because defendant was involved in procuring the absence of the murdered witness. Ibid.; see also State v. Hallum, 606 N.W.2d 351, 356 (Iowa 2000) (stating that defendant who procures witness's unavailability is precluded from asserting both confrontation right and right to object on hearsay grounds).
Concededly, some states adopting the forfeiture-by-wrongdoing doctrine have held that application of the doctrine does not preclude hearsay objections under relevant evidence rules and, therefore, the admission of such testimony depends on the applicability of a valid hearsay objection. In Vasquez v. People, the Supreme Court of Colorado held that the doctrine of forfeiture by wrongdoing only applies to confrontation rights and does not preclude hearsay objections. 173 P.3d 1099, 1101-02 (2007) (en banc). The court noted that a number of jurisdictions had held that forfeiture by wrongdoing automatically prohibits a hearsay objection to the unavailable witness's testimony, id. at 1106, and further acknowledged that the "hearsay rules and the Confrontation Clause are generally designed to protect similar values, both defending against the dangers of using out-of-court declarations as proof," and that the Confrontation Clause provides more expansive protections, ibid. (quoting White, supra, 116 F.3d at 912-13). The court determined, however, that "the more prudent course is to require that the hearsay rules be satisfied separately." Ibid. It reasoned that hearsay is presumptively unreliable evidence and "the fact that the defendant has forfeited his confrontation rights by wrongdoing does not render the evidence reliable." Ibid. Accordingly, the court held that "the reliability of the evidence must still be ensured according to the standards of the Colorado Rules of Evidence." Ibid.[7]

*313 II.
Our Court is now presented with the opportunity to apply the common law doctrine of forfeiture by wrongdoing, which we are now expressly adopting. However, in doing so, I respectfully part company with my colleagues in that I would fully adopt the common law doctrine and hold that a defendant found to have procured a witness's unavailability is precluded from objecting to the admissibility of the witness's testimony on both confrontation clause and hearsay grounds.
The common law doctrine contains well-recognized decisional strands, based in equity, that hold that a defendant who wrongfully procures the unavailability of a witness at trial forfeits his right to confront that witness and also his right to object on grounds of hearsay. In essence, a court is doing no more than admitting evidence that would have been admissible had the witness been available to testify. In 1982, in Steele v. Taylor, the Sixth Circuit described the admission of such evidence in substantially those terms:
Our research has disclosed no case in which a court upon a finding of wrongful conduct has declined to admit prior statements that would have come in had the witness taken the stand. Neither has our research disclosed a case finding that a defendant wrongfully causes a witness's unavailability by exercising the right at trial to object to the presence, capacity or testimony of the witness.
From these cases we derive essentially the same rule as the one stated by the state trial judge: A prior statement given by a witness made unavailable by the wrongful conduct of a party is admissible against the party if the statement would have been admissible had the witness testified. The rule ... is based on a public policy protecting the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness. The rule is also based on a principle of reciprocity similar to the equitable doctrine of "clean hands." The law prefers live testimony over hearsay, a preference designed to protect everyone, particularly the defendant. A defendant cannot prefer the law's preference and profit from it, as the Supreme Court said in Reynolds, while repudiating that preference by creating the condition that prevents it. [684 F.2d 1193, 1202 (6th Cir.1982) (internal citations and quotations omitted).]
Over a decade later, the Court of Appeals for the District of Columbia similarly explained that reliability was not the principal concern of the doctrine of forfeiture by wrongdoing. In White, supra, the D.C. Circuit was presented with an argument by defendants that, notwithstanding that they had forfeited their rights under the hearsay rule in addition to their confrontation rights, the trial court nevertheless "should have more intensively screened [the unavailable witness's] statements for reliability." 116 F.3d at 913. In rejecting *314 that claim, the court stated that "[t]he government should be no worse off than if defendants had not murdered [the witness]," ibid., and held that "[t]he trial court properly ruled that the forfeiture would cover only the first layer of hearsay, allowing admission of those statements that would have been admissible if [the witness] himself had made them on the witness stand, no more and no less," ibid. The court noted that the defendants were free to seek "exclusion under Rule 403 based upon the lack of reliability of the agents who relayed [the witness's] testimony, but they have identified no trial court error on that score. Thus the evidence did not fall short of the minimal reliability standards of constitutional due process and Fed.R.Evid. 403." Ibid.
In my view, there are ample procedural safeguards inherent in the common law doctrine. First, as the federal circuits initially recognized and most states require, at a minimum, the prosecution must prove by a preponderance of the evidence that the defendant procured the witness's unavailability. See Fed.R.Evid. 804(b)(6) advisory committee's note. That requirement ensures that the defendant actually prevented the witness from testifying. Second, the normal balancing test required under Evidence Rule 403 generally, and sufficiently, excludes unreliable and prejudicial evidence. See generally Kelly Rutan, Comment, Procuring the Right to An Unfair Trial: Federal Rule of Evidence 804(b)(6) and the Due Process Implications of the Rule's Failure to Require Standards of Reliability for Admissible Evidence, 56 Am. U.L.Rev. 177, 201-02 (2006). Evidence Rule 403 states that "evidence may be excluded if its probative value is substantially outweighed by the risk of [ ]unfair prejudice." Clearly evidence that is deemed so unduly unreliable as to be prejudicial to the defendant would not be admitted into evidence. Such evidence would be excluded on non-hearsay grounds even if the declarant had been available to testify. When applicable, the same reasoning, not a claim of hearsay, should prevent the admissibility of the evidence when the defendant procures the declarant's unavailability.[8]
The question is not one of reliability but one of broad public policy:
whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries, and turn them into a solemn farce. By adopting the doctrine of forfeiture by wrongdoing, we, like many other jurisdictions, recognize that neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.
[Edwards, supra, 830 N.E.2d at 176 (internal quotations and citations omitted).]
In my view, we can include a forfeiture-by-wrongdoing exception in our evidence rules, however, we need not "create," through the formal adoption of an evidence rule, a new "exception" for hearsay when the evidence must not be analyzed and treated in such manner. Rather, we should recognize that our courts have equitable powers, long-accepted in this nation's common law, for addressing a defendant's wrongdoing that undermines the *315 judicial system. Our Constitution envisioned a system in which the common law would remain in force until it was in someway altered, superseded or repealed. Not only was the common law to remain in force, but our courts were granted the power to adapt and apply it as needs arose.
Thus, although I have no quarrel with the majority's determination that our evidence rules would benefit from the inclusion of an express rule to address the admission of evidence in such circumstances, I would not insist that the enactment of a hearsay exception precede further proceedings on remand to correct the process by which the unavailable witness's testimony was admitted. I would remand for a new Rule 104 hearing at which the State and defendants were present and were allowed to examine the witness to establish whether he was truly unavailable to testify and whether his unavailability was the result of defendants' wrongdoing. If so, then I would affirm defendants' convictions. If not, the conviction must be reversed.
Justices RIVERA-SOTO and HOENS join in this opinion.
For affirmance  Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS  7.
Opposed  None.
NOTES
[1] Byrd was found not guilty of purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(2), second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a), and third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b). Dean was found not guilty of purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(2), second-degree possession of a shotgun for an unlawful purpose, N.J.S.A. 2C:39-4(a), and third-degree unlawful possession of a shotgun, N.J.S.A. 2C:39-5(c)(2).
[2] Unlike Bush, Hassan Wilson did testify at trial, but repudiated a statement implicating Byrd and Dean that he had given to the police. Wilson's out-of-court statement to the police was read to the jury and supported many of the details provided in Bush's statement.
[3] A court can hold a witness in civil contempt for refusing to testify and incarcerate that witness until such time as he purges himself of the contempt by testifying. In re Daniels, 118 N.J. 51, 59, 570 A.2d 416, cert. denied, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). Incarceration under civil contempt can last no longer than the life of the proceedings. See id. at 60, 570 A.2d 416.

The court also has the power to hold a recalcitrant witness in criminal contempt. N.J.S.A. 2C:1-5(c) ("This section does not affect the power to punish for contempt, either summarily or after indictment, or to employ any sanction authorized by law for the enforcement of an order or a civil judgment or decree."); N.J.S.A. 2C:29-9(a) ("A person is guilty of a crime of the fourth degree if he purposely or knowingly disobeys a judicial order or protective order, ... or hinders, obstructs or impedes the effectuation of a judicial order or the exercise of jurisdiction over any person, thing or controversy by a court, administrative body or investigative entity.").
[4] In State v. Sheppard, a child sex abuse case, the trial court relied on the forfeiture-by-wrongdoing doctrine as one of its reasons for allowing the live videotaping of a child-witness's testimony out of the presence of the defendant. 197 N.J.Super. 411, 435-43, 484 A.2d 1330 (Law Div.1984). Unlike the present case, however, the court ruled that the child-witness would be subject to cross-examination by defense counsel, who would be present in the same room. Id. at 442-43, 484 A.2d 1330. In addition, the testimony of the child was to be carried live through a video feed to a courtroom where the judge, jury, and defendant would be present, and the defendant would have the ability to confer with counsel. Ibid.
[5] "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). Generally, hearsay is not admissible at a trial or a hearing unless specifically exempted by an evidence rule or other law. N.J.R.E. 802.
[6] See, e.g., State v. Valencia, 924 P.2d 497, 502-05 (App.1996); Vasquez v. People, 173 P.3d 1099 (Colo.2007); Devonshire v. United States, 691 A.2d 165 (D.C.), cert. denied, 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997); People v. Stechly, 225 Ill.2d 246, 312 Ill.Dec. 268, 870 N.E.2d 333, 348-53 (2007); State v. Hallum, 606 N.W.2d 351 (Iowa 2000); State v. Gettings, 244 Kan. 236, 769 P.2d 25, 28-30 (1989); Commonwealth v. Edwards, 444 Mass. 526, 830 N.E.2d 158 (2005); People v. Bauder, 269 Mich.App. 174, 712 N.W.2d 506 (2005), appeal denied, 476 Mich. 863, 720 N.W.2d 287 (2006); State v. Fields, 679 N.W.2d 341, 345-47 (Minn. 2004); State v. Alvarez-Lopez, 136 N.M. 309, 98 P.3d 699, 703-07 (2004), cert. denied, 543 U.S. 1177, 125 S.Ct. 1334, 161 L.Ed.2d 162 (2005); People v. Geraci, 85 N.Y.2d 359, 625 N.Y.S.2d 469, 649 N.E.2d 817, 820-24 (1995); Commonwealth v. Paddy, 569 Pa. 47, 800 A.2d 294, 310 n. 10 (2002); State v. Ivy, 188 S.W.3d 132, 145-48 (Tenn.), cert. denied, 549 U.S. 914, 127 S.Ct. 258, 166 L.Ed.2d 200 (2006); State v. Jensen, 299 Wis.2d 267, 727 N.W.2d 518, 529-36 (2007).
[7] The New Jersey Constitution contains a similarly worded Confrontation Clause in Article I, Paragraph 10: "In all criminal prosecutions the accused shall have the right ... to be confronted with the witnesses against him." N.J. Const. art. I, ¶ 10.
[8] Article VI, Section 2, Paragraph 3 provides that "[t]he Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." N.J. Const. art. VI, § 2, ¶ 3.
[9] During the Convention's proceedings, several legal luminaries expressed their views concerning the procedural and substantive nature of evidence. For example, when New Jersey Attorney General Walter D. Van Riper was asked if he would invest the Supreme Court with rule-making power, he replied, "Yes, sir, I would, very broadly." 4 Proceedings of the Constitutional Convention of 1947, at 290. However, the Attorney General was less enthusiastic about conferring on the Court unilateral authority over the rules of evidence, stating that he would give, at least in part, the rule-making power over evidence to the Legislature. See id. at 291. During this exchange, Frank H. Sommer, a delegate to the Convention, noted that "[s]ome of the rules of evidence certainly are of a substantive nature rather than procedural." Id. at 290. Later, Sommer, a former dean of New York School of Law, further expounded on the breadth of the proposed rule-making power of the Court, explaining that "[i]t's a complete rule-making power except on some points, not extending to changes on rules of evidence." Id. at 320. Chancellor A. Dayton Oliphant, who later was one of the first seven Justices to sit on the New Jersey Supreme Court, was emphatic on the subject, "disagree[ing] with the wisdom of giving to the [judicial] rule-making body, as provided in the 1944 draft, power to make rules as to evidence." Id. at 409 (citation omitted).
[10] Federal Rule of Evidence 807 provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
See also Conn.Code Evid. § 1-2(b) ("Where the Code does not prescribe a rule governing the admissibility of evidence, the court shall be governed by the principles of the common law as they may be interpreted in the light of reason and experience.... The provisions of the Code shall not be construed as precluding any court from recognizing other evidentiary rules not inconsistent with such provisions."); Ind. Evid. R. 101(a) ("If these rules do not cover a specific evidence issue, common or statutory law shall apply.").
[11] In Jacober v. St. Peter's Medical Center, we adopted by judicial decisionmaking the learned treatise rule because adopting that rule did not "pose as serious and far-reaching consequences as the rule considered in D.R." and because the new rule merely constituted the "modifying [of] a pre-existing common-law rule of evidence." 128 N.J. 475, 494, 608 A.2d 304 (1992) (citation and internal quotation marks omitted).
[12] We have appended to this opinion the proposed rule that we will submit to the Legislature and Governor for their consideration.
[13] N.J.R.E. 104(a) provides that "[w]hen ... the admissibility of evidence ... is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge.... The judge may hear and determine such matters out of the presence or hearing of the jury."
[14] There may be a case in which a court will conclude that entry of a contempt order will be an act of futility. Ultimately, the court must exercise its sound discretion in determining the means to enforce its orders.
[1] See N.J. Const. of 1776, art. 22 ("That the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted, as are repugnant to the rights and privileges contained in this charter...."); N.J. Const. of 1844, art. 10, ¶ 1 ("The common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature....").
[2] This Court's authority to adopt and develop common law principles when the Legislature has not spoken is a powerful tool. Although the creation of an evidence code decreases the flexibility afforded to the courts, all judicial authority in respect of evidential matters has not been lost. Evidence Rule 102 provides that the evidence rules "shall be construed to secure fairness in administration and elimination of unjustified expense and delay. The adoption of these rules shall not bar the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." N.J.R.E. 102. To turn to the common law when addressing a court's ability to react to alleged wrongdoing by a defendant that hampers the conduct of a trial is nothing more than to resort to equitable principles upon which the forfeiture-by-wrongdoing doctrine is grounded.
[3] The doctrine in England's law was that "if the prisoner had resorted to a contrivance to keep a witness out of the way, the deposition of the witness, taken before a magistrate and in the presence of the prisoner, might be read. Other cases to the same effect are to be found, and in this country the ruling has been in the same way." Drayton v. Wells, 10 S.C.L. 409, 1 Nott & McC. 409 (S.C.1818); Williams v. State, 19 Ga. 403 (1856).
[4] Rule 807 allows for the admissibility of hearsay statements not specifically covered by the Rules but, "having equivalent circumstantial guarantees of trustworthiness."
[5] The commentary to the Rule provides that, "the usual Rule 104(a) preponderance of the evidence standard [has been adopted] in light of the behavior the new Rule 804(b)(6) seeks to discourage." Fed.R.Evid. 804(b)(6), advisory committee's note.
[6] Generally under other hearsay exceptions, such as Rules 803, 804, and 807, out-of-court statements of the unavailable defendant are admissible because some indicia of reliability exists, and thus there is no need to produce the declarant to be confronted for cross-examination. See Paul W. Grimm & Jerome E. Deise, Jr., Hearsay, Confrontation, and Forfeiture by Wrongdoing: Crawford v. Washington, a Reassessment of the Confrontation Clause, 35 U. Balt. L.F. 5, 32 (2004).
[7] The evidence was admitted in Vasquez under Colorado Rule of Evidence 807, the residual hearsay exception. Id. at 1106.

The Supreme Court of California also has addressed whether, under the forfeiture-by-wrongdoing doctrine, a defendant waives his right to object to testimony on hearsay grounds and has concluded that the doctrine operates only to bar a defendant's objection under the confrontation clause when the proponent shows that it is more probable than not that the defendant procured the unavailability of the witness. See People v. Giles, 40 Cal.4th 833, 55 Cal.Rptr.3d 133, 152 P.3d 433, 446-47 (2007). The court held that the doctrine does not bar objections under its evidence code, explaining that "even if it is established that a defendant has forfeited his or her right of confrontation, the contested evidence is still governed by the rules of evidence; a trial court should still determine whether an unavailable witness's prior hearsay statement falls within a recognized hearsay exception and whether the probative value of the proffered evidence outweighs its prejudicial effect." Ibid.
[8] Many states and circuit courts of appeals have recognized that the Due Process clause may protect a defendant, who threatens a potential witness into not testifying at trial, from the admission of unduly prejudicial extrajudicial statements. See, e.g., Carlson, supra, 547 F.2d at 1360 n. 14 ("Elements of due process under the Fifth Amendment may enter into the analysis if the fairness of the trial is sacrificed.").