SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Ashley D. Bailey (A-60-20) (085342)**

**Argued January 19, 2022 -- Decided June 21, 2022**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal of defendant Ashley D. Bailey's conviction of two counts of second-degree official misconduct, the Court considers whether the crime-fraud exception to the marital communications privilege governed text messages that defendant exchanged with her husband on September 16, 2014 -- after the Court proposed the exception in State v. Terry, 218 N.J. 224 (2014), but before the Legislature enacted it into law via L. 2015, c. 138, § 2.

Defendant and Edwin Ingram married in 2011 and remained married until Ingram's death in 2016. They had two children. In April 2014, the New Jersey State Police commenced an investigation of an alleged drug distribution network operating in Camden. The investigators identified Edwin Ingram and his brother, his half-brother, and three other men as targets of the investigation.

As a Camden County police officer, defendant had access to the Police Department's Law Enforcement Advanced Applications (LEAA) system, a secure records-management system containing police reports. In June 2014, defendant used her username and password to access a number of reports in the LEAA system regarding Edwin Ingram and others. As defendant later admitted to investigators and at trial, accessing police reports on an investigation to which she was not assigned was outside the scope of her duties as a police officer.

Beginning in August 2014, investigators wiretapped phones associated with defendant, her husband, and other targets of the investigation. The State contended that immediately after the wiretaps commenced, the volume of calls between defendant and the targets of the investigation dropped dramatically, revealing that defendant told her husband and his associates that police were wiretapping their conversations. Defendant and her husband exchanged the text messages at issue in this appeal and which are reproduced in the Court's opinion; the messages appear to reference and express concern about the investigation. And a wiretapped phone conversation by a target of the investigation indicated awareness that police were

1

watching him; the call came after defendant had returned home shortly after an October 2014 police briefing at which the investigation was discussed.

Police arrested targets of the investigation and defendant in October 2014. Defendant gave two statements in the immediate aftermath of her arrest. She admitted that she had accessed the LEAA system to review police reports on Edwin Ingram and his associates but denied that her actions were intended to benefit Ingram or anyone else. Defendant claimed that she made numerous phone calls to her husband's associates in an attempt to locate him and denied that the abrupt decrease in the number of calls was related to the wiretaps. Defendant admitted that when she returned home after the briefing, she discussed the briefing with her husband but said that any disclosure was "[n]ot about giving information away," but rather "was more about trying to get to the bottom of the truth."

In a 103-count indictment, a grand jury charged defendant, Edwin Ingram, and 32 others with offenses related to the drug distribution network. Defendant was indicted for second-degree conspiracy to distribute a controlled dangerous substance and two counts of second-degree official misconduct.

Shortly before trial, defendant moved to exclude the text messages that she exchanged with Edwin Ingram in September 2014 on the ground that they were protected by the marital communications privilege. Defendant argued that because the Legislature had not yet amended N.J.S.A. 2A:84A-22 to adopt the crime-fraud exception to the marital communications privilege when she and Edwin Ingram exchanged the text messages, the trial court should not apply that exception. The trial court admitted the text messages into evidence, and the State read them into the record. The jury acquitted defendant of conspiracy but convicted her of both counts of official misconduct.

The Appellate Division affirmed defendant's conviction and sentence. Relying on its decision in State v. Rose, 425 N.J. Super. 463, 468 (App. Div. 2012), the appellate court held that the amendment to N.J.R.E. 509 was a procedural rule that did not violate ex post facto laws when applied to admit text messages exchanged before the amendment. The Court granted certification, limited to whether the marital communications privilege applies here. 246 N.J. 229 (2021).

**HELD:** The crime-fraud exception cannot be properly applied to marital communications that preceded the Legislature's amendment of N.J.R.E. 509. The Court finds no evidence that the Legislature intended that amendment to retroactively apply to otherwise privileged marital communications that occurred prior to that amendment. The trial court's admission of the text messages therefore constituted error. However, that error was harmless given the extensive evidence presented by the State in support of defendant's official misconduct convictions.

2

1. The marital communications privilege, codified in N.J.S.A. 2A:84A-22 and N.J.R.E. 509, prevents disclosure by a spouse of confidential communications made during marriage except under specified circumstances. In September 2014, when defendant and her husband exchanged the text messages at issue here, N.J.S.A. 2A:84A-22 and N.J.R.E. 509 did not prescribe a crime-fraud exception to the marital communications privilege, in contrast to the attorney-client privilege, the physician-patient privilege, the cleric-penitent privilege, the trade secret privilege, and the mediation privilege, all of which included a crime-fraud exception. In Terry, the Court held that the version of N.J.R.E. 509 then in effect shielded confidential communications between spouses that were intercepted by a wiretap. 218 N.J. at 234-39. The Court noted, however, that "[t]he marital communications privilege is meant to encourage marital harmony, not to protect the planning or commission of crimes." Id. at 239. The Court held that N.J.R.E. 509 "should be amended to include a crime-fraud exception that is similar to the exceptions that apply in federal and state courts throughout the nation as well as other evidentiary rules in New Jersey." Id. at 241. (pp. 20-23)

2. On November 9, 2015, the Legislature amended N.J.S.A. 2A:84A-22 to create a crime-fraud exception to the marital communications privilege. L. 2015, c. 138, § 2. N.J.R.E. 509 was amended to conform to the change. The Legislature found that an amendment to N.J.R.E. 509 in accordance with the Court's proposal in Terry would "aid in preventing the unintended consequence of immunizing the criminal activity of certain spouses and partners who invoke the privilege, while preserving the general privilege and its intended purpose of protecting and encouraging free and uninhibited communication and confidence between spouses and civil union partners." Id. § 1(d). The Legislature provided that the enactment would "take effect immediately." Id. § 3. (pp. 23-25)

3. Defendant's constitutional challenge to the application of the amended version of N.J.R.E. 509 is premised on the clauses of the United States and New Jersey Constitutions that prohibit the Legislature from passing ex post facto laws. An ex post facto law is defined by two critical elements. First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it. The United States Supreme Court has identified four categories of laws that violate the ex post facto doctrine if applied retroactively to conduct that occurred before the challenged law was in effect, and it has contrasted the laws that fit into those categories with ordinary rules of evidence, which do not violate the clause because they are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case and because they do not at all subvert the presumption of innocence. New Jersey Courts have likewise concluded that retroactive application of a new evidence rule to misconduct preceding the rule's effective date did not offend the ex post facto clause. See, e.g., Rose, 425 N.J. Super. at 469-73. (pp. 25-29)

3

4.  This appeal, however, does not involve an ordinary rule of evidence, but a privilege.  Privileges implicate policy considerations not raised by exceptions to the hearsay rule or other rules of evidence.  Moreover, the crime-fraud exception to a privilege is not in the category of evidentiary rules that are ordinarily evenhanded.  Instead, the amendment at issue in this appeal uniformly benefits the State in its prosecution of criminal defendants.  Given the unique status of privileges in the law, the Court does not view the retrospective application of the evidence rules to govern this appeal.  Rather, the Court finds the general rule favoring prospective application of statutes more appropriate to consideration of the privilege at issue here.  The Court declines to infer that the Legislature sought to retroactively abrogate or eliminate a privilege absent clear evidence of legislative intent.  (pp. 29-31)

5.  The Legislature could have directed that the crime-fraud exception would apply to marital communications that preceded the amendment's effective date, but it did not do so.  To the contrary, the Legislature stated that the amendment would "take effect immediately," L. 2015, c. 138, § 3, thus choosing language that is generally construed to denote prospective effect.  In the absence of evidence of legislative intent that the amendment to N.J.R.E. 509 would retroactively abrogate a privilege, the Court views that amendment to apply prospectively to marital communications that were made on or after the effective date, consistent with the doctrine of constitutional avoidance.  Accordingly, the crime-fraud exception to the marital communications privilege does not apply to the text messages at issue in this appeal.  The fact that investigators lawfully obtained the text messages in the course of their investigation does not affect the communications' privileged status.  Those messages were therefore inadmissible at defendant's trial.  (pp. 32-34)

6.  Turning to whether admission of the text messages at trial was reversible error, the Court reviews the requirements for a conviction of official misconduct, as well as the substantial evidence that the State presented as to each element of that charge that was independent of the text messages, including defendant's own admissions; the timeline of phone calls, including the abrupt decline in the volume of calls after the wiretaps commenced; the wiretapped call indicating awareness of the investigation; and evidence that defendant relayed the information presented at the police briefing.  The trial record does not suggest that the improper admission of the text messages under the crime-fraud exception to the marital privilege led to an unjust verdict.  Accordingly, the trial court's error was harmless, and the Appellate Division properly affirmed defendant's conviction.  (pp. 34-39)

**AFFIRMED AS MODIFIED.**

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, SOLOMON and PIERRE-LOUIS; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PATTERSON's opinion.**

4

SUPREME COURT OF NEW JERSEY

A-60 September Term 2020

085342

State of New Jersey,

Plaintiff-Respondent,

v.

Ashley D. Bailey,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| January 19, 2022 | June 21, 2022 |

Elizabeth C. Jarit, Deputy Public Defender, argued the
cause for appellant (Joseph E. Krakora, Public Defender,
attorney; Candace Caruthers, Assistant Deputy Public
Defender, of counsel and on the briefs, and Frank M.
Gennaro, Designated Counsel, on the briefs).

Kevin J. Hein, Special Deputy Attorney General/Acting
Assistant Prosecutor, argued the cause for respondent
(Grace C. MacAulay, Camden County Prosecutor,
attorney; Kevin J. Hein, of counsel and on the briefs, and
Linda A. Shashoua, Special Deputy Attorney
General/Acting Assistant Prosecutor, on the briefs).

Shira Wisotsky argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,

attorneys; Shira Wisotsky, Alexander Shalom, and Jeanne LoCicero, on the brief).

Janie Byalik argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

William P. Cooper-Daub, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Andrew J. Bruck, Acting Attorney General, attorney; William P. Cooper-Daub, of counsel and on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

The marital communications privilege bars spouses and civil union partners from disclosing "any communication made in confidence between such person and his or her spouse or civil union partner." N.J.R.E. 509; N.J.S.A. 2A:84A-22(1).

On July 22, 2014, this Court proposed that the Legislature amend N.J.R.E. 509 to adopt a crime-fraud exception to the marital communications privilege. State v. Terry, 218 N.J. 224, 229-30 (2014). Effective November 9, 2015, the Legislature amended N.J.S.A. 2A:84A-22 to provide that no marital privilege shields communications "in a criminal action or proceeding if the communication relates to an ongoing or future crime or fraud in which the spouses or partners were or are joint participants at the time of the

2

communication." L. 2015, c. 138, § 2 (codified at N.J.R.E. 509(2)(e); N.J.S.A. 2A:84A-22(2)(e)).  N.J.R.E. 509 was amended in accordance with the Legislature's action.

In this appeal of defendant Ashley D. Bailey's conviction of two counts of second-degree official misconduct, we determine whether the crime-fraud exception to the marital communications privilege governed text messages that defendant exchanged with her husband on September 16, 2014 -- after the Court proposed the exception, but before the Legislature enacted it into law.

The trial court held that the crime-fraud exception properly applied to the text messages without raising ex post facto concerns and admitted the messages into evidence at defendant's trial.  The Appellate Division affirmed.

We disagree that the crime-fraud exception can be properly applied to marital communications that preceded the Legislature's amendment of N.J.R.E. 509.  We find no evidence that the Legislature intended that amendment to retroactively apply to otherwise privileged marital communications that occurred prior to that amendment.  We therefore hold that the trial court's admission of the text messages constituted error.  However, we view that error to be harmless given the extensive evidence presented by the State in support of defendant's official misconduct convictions.

Accordingly, we modify and affirm the Appellate Division's judgment.

I.

A.

1.

Defendant and Edwin Ingram married in 2011 and remained married until Ingram's death in 2016.[1] They had two children.

After serving as a corrections officer in Delaware for four years, defendant joined the Camden County Police Department as a patrol officer on December 14, 2013.

2.

In April 2014, the New Jersey State Police commenced "Operation Southern District," an investigation of an alleged drug distribution network operating in Camden. In the early stages of the investigation, detectives working undercover conducted controlled purchases of narcotics from some of the individuals suspected of participating in the distribution network. The investigators identified Edwin Ingram; his brother, Nathan Ingram; his half-brother, Fidel Webb; and three other men, Donyell Calm, Lawrence Brown, and Kareem Anderson, as targets of the investigation.

As a Camden County police officer, defendant had a username and password that allowed her to access the Police Department's Law Enforcement

---

[1] We derive our summary of the facts from the trial record.

4

Advanced Applications (LEAA) system, a secure records-management system containing police reports.

On June 10, 2014, defendant used her username and password to sign into the LEAA system while she was in her patrol car. She accessed six police reports regarding Edwin Ingram, two police reports regarding Webb, and one police report regarding Calm. On June 19, 2014, the same day that an undercover officer conducted a controlled drug purchase from Edwin Ingram and Calm, defendant again accessed the LEAA system to review four additional police reports regarding Calm.

As defendant later admitted to investigators and at trial, accessing police reports on an investigation to which she was not assigned was outside the scope of her duties as a police officer.

3.

As "Operation Southern District" progressed, detectives obtained Communications Data Warrants with respect to the targeted individuals' telephone facilities. Beginning in June 2014, the warrants enabled the officers to retrieve data from the telephone facilities through Dialed Number Recorders that identified calls and text messages to and from each targeted facility without revealing their content.

5

The detectives then obtained court orders authorizing them to wiretap the telephones of some of the individuals investigated. Beginning on August 13, 2014, investigators wiretapped phones associated with defendant, Edwin Ingram, Nathan Ingram, Calm, and other targets of the investigation.

The State contended at trial that immediately after the wiretaps commenced, the volume of calls between defendant and the targets of the investigation dropped dramatically, and that this revealed that defendant told her husband and his associates that police were wiretapping their conversations. The lead detective in the investigation, Detective Sergeant Keith Moyer, testified that between June 2014 and August 13, 2014, the Dialed Number Recorder identified 129 telephone calls between defendant's telephone facility and the telephone facilities of Calm and other targets of the drug investigation, including fourteen calls between defendant's telephone and Calm's telephone on a single day. Moyer testified that after August 13, 2014, the Dialed Number Recorder identified only six calls between defendant and the targets of the investigation. According to the State, Moyer also told the jury that the volume of calls between Edwin Ingram and other targets of the

6

investigation dropped from 939 calls before the wiretaps commenced to six calls thereafter.[2]

Police intercepted a call between Calm and Anderson at 2:17 p.m. on September 16, 2014. Calm told Anderson that an unnamed person was "scared as hell," and that the person "said he was wondering why IA was near his crib." The State contended that in that conversation, Calm was discussing Edwin Ingram, who had learned from defendant that the Camden County Police Department's Internal Affairs Unit was investigating her.

4.

On September 16, 2014, defendant and Edwin Ingram exchanged the following text messages:

> DEFENDANT: Don't get yourself all worked up. It's nothing you can change about it, if it's done. We had our chance, even me, to throw in the towel . . . and get free of it all. And I chose you, so I chose my fate. S\*\*\* happens. I guess it was just in God's plan. I'm stressed, but it's nothing I can change.
>
> EDWIN INGRAM: It ain't nothing. Don't worry about it. As long as you're not a crooked cop, we'll be good.
>
> DEFENDANT: That's not true. There's more to it than just that. I tried so many times to explain how much more that included, but I chose to be here, so I am just

---

[2] Moyer's testimony regarding that comparison is missing from the trial transcript due to a recording malfunction in the courtroom.

as responsible. I promised myself that I wouldn't make it here, but what can I do about it?

EDWIN INGRAM: It ain't even nothing. People just talking. You off?

DEFENDANT: They talking and they thinking up a plan, babe. But no worries. I'm relieved they foo what I couldn't. A good plan.

EDWIN INGRAM: How long you going to be out?

DEFENDANT: You are not going to believe what I was told tonight.

EDWIN INGRAM: What?

DEFENDANT: It's true.

EDWIN INGRAM: How did that happen?

DEFENDANT: One of the guys working with L3 Narc. F**k, f**k, f**k. How did I f**king get here? WTF? I am so f**king disappointed with myself. I am so f**king stressed now.

EDWIN INGRAM: What? They know nothing.

DEFENDANT: I don't know what he knows. It's time for me to brace myself. I accept what's for me. I accepted that when I chose you. We chose each other and I'm ready for that battle. I don't care. I chose to love and that's all that matters. You love me and I love you, so let them bring me what I knew would come someday.

EDWIN INGRAM:  We gonna be good.  Let them watch.

DEFENDANT:  I know.  If not, we still got each other and that's good enough for me.  It's time for you to choose, though.  Choose to let us burn or choose to help us beat this.  I can't make that decision for us.  Look where it got us now.  I could use a hug and a foot rub.  You up for it?

EDWIN INGRAM:  I got us.  Watch.

5.

Sergeant Robert Borger of the Camden County Police Department testified that at 5:00 a.m. on October 23, 2014, he conducted a roll call attended by defendant and one other Camden County police officer, and read an intelligence briefing to the two officers.  Detective Moyer testified that although the information stated in the briefing was accurate, the briefing was "designed to be given specifically to [defendant]" as part of the Department's investigation of her conduct, and that defendant "then acted on" the information provided to her.

The briefing concerned two separate shooting incidents involving the same victim, Q.L., in a single week in April 2014.  Sergeant Borger told defendant and the other officer that Calm had contacted a detective in the Camden County Prosecutor's Office to discuss the shooting of Q.L.  According to the briefing, Calm told the detective that he and another man had

followed Q.L. to recover money that Calm believed Q.L. had stolen from him, that Q.L. had exited his car and fired a handgun at Calm, and that the man accompanying Calm had fired back in self-defense.

The briefing ended with the disclosure that a "hit" on the National Integrated Ballistic Information Network's crime scene ballistics database "just confirmed that the nine millimeter casing from the April 12th shooting of [Q.L.] matched those of a criminal mischief on September 26, 2014 . . . right in front of Calm's house."

After the briefing, defendant told Sergeant Borger that she was familiar with Calm.

According to a GPS report on the location of defendant's patrol car, defendant left police headquarters after the briefing and returned home at 5:50 a.m., where she remained for two minutes. She then left her home in her patrol car. She returned to her home at 7:25 a.m. and remained there for forty-one minutes.

At 10:06 a.m. that day, Edwin Ingram's half-brother Webb called Calm and told him to meet him at the Ferry Avenue Train Station in Camden and to come alone. Detectives conducted surveillance of the meeting between Webb and Calm in the train station that morning, and a subsequent meeting between the two men later that day at a different location.

10

Shortly after his initial meeting with Webb on the day of the intelligence briefing, Calm called an unidentified woman whose comments indicated that she lived outside New Jersey, and asked her about a house for sale in her neighborhood. Calm said "I need to . . . I got to bail. Like ASAP. ASAP."

Later that morning, Calm told Anderson in a wiretapped call, "word up somebody just told me I'm hot, I'm being watched," and that "they been watching me since that s*** with this guy." Calm added that "what added more fuel to the fire you heard . . . that day when you came out here" was that the "jawns" were "linked to the other s***," and were "the same jawns." In a wiretapped conversation later the same day, Calm reiterated to Anderson that he was "hot" and that the "jawns" were "filthy dirty."

Detective Moyer testified that based on his experience and the context of the conversations, he viewed Calm's references to "jawns" to denote shell casings.

## B.

On October 28, 2014, detectives arrested Edwin Ingram, Nathan Ingram, Calm, Webb, Anderson, and other targets of "Operation Southern District." They executed search warrants at several of the targets' homes, where they recovered drugs, paraphernalia, guns, and cellphones. Detectives arrested defendant the same day.

11

Defendant gave two statements to police in the immediate aftermath of her arrest. She stressed that her relationship with Edwin Ingram was strained, that he provided no financial support to her or their children, and that he sold drugs and lied about it. Defendant stated that she was a victim of domestic violence.

Defendant admitted that she had accessed the LEAA system to review police reports on Edwin Ingram and his associates. She stated that she checked for information about her husband first and then sought information on individuals mentioned in the police reports that she found. Defendant commented that she ran "every random tag I can . . . just like -- what my heart agrees with." She admitted that she had made "personal use" of the LEAA system but denied that her actions were intended to benefit Edwin Ingram, Calm, or anyone else. Defendant claimed that she made numerous phone calls to her husband's associates in an attempt to locate him and denied that the abrupt decrease in the number of calls after detectives began wiretapping the targets' phones was related to the wiretaps.

Defendant admitted that when she returned home after the October 23, 2014 briefing, she discussed the briefing with her husband. She said that she was angry with her husband for associating with Calm and thought that she told her husband that Calm "is being investigated." Defendant said that

12

"maybe out of anger, maybe I was yelling about him being mixed up, maybe I did mention it."  She said that any such disclosure was "[n]ot about giving information away, or trying to gain some kind of ramification or give somebody a head's up.  It was more about trying to get to the bottom of the truth with his lie."

## II.

## A.

### 1.

In a 103-count indictment filed on November 25, 2015, a grand jury charged defendant, Edwin Ingram, Nathan Ingram, Webb, Calm, Anderson, Brown, and twenty-seven others with offenses related to the drug distribution network investigated in "Operation Southern District."  Defendant was indicted for second-degree conspiracy to distribute a controlled dangerous substance and two counts of second-degree official misconduct.

### 2.

Defendant and Nathan Ingram were tried in an eight-day jury trial beginning on October 12, 2017.

Shortly before trial, defendant moved to exclude the text messages that she exchanged with Edwin Ingram on September 16, 2014 on the ground that they were protected by the marital communications privilege.  Defendant

argued that because the Legislature had not yet amended N.J.S.A. 2A:84A-22 to adopt the crime-fraud exception to the marital communications privilege when she and Edwin Ingram exchanged the text messages, the trial court should not apply that exception. The State contended that the crime-fraud exception to the marital communications privilege applied in defendant's trial to communications that preceded the amendment, and that the privilege therefore did not protect defendant's September 16, 2014 text messages.

The trial court held that the post-amendment version of N.J.R.E. 509 governed the text messages, and that the application of the crime-fraud exception to the marital communications privilege would not offend ex post facto laws. The court accordingly ruled that if the text messages met the requirements of the crime-fraud exception to the privilege, they would be admitted at trial.

At trial, the State presented the testimony of Moyer, Borger, and other detectives regarding defendant's use of the LEAA system to access police reports in June 2014, the volume of calls before and after police began wiretapping the targets' communications, the content of wiretapped communications, and the October 23, 2014 intelligence briefing.

14

The trial court admitted the September 16, 2014 text messages between defendant and Edwin Ingram into evidence, and the State read them into the record.

Defendant testified before the jury that Edwin Ingram lied to her and was unfaithful to her, and that she disliked his associates, whom she knew were drug dealers. She told the jury that she nonetheless stayed with her husband because she loved him and was concerned about their children.

Defendant stated that she accessed police reports on Edwin Ingram and his associates on the LEAA system in order to determine whether her husband had lied to her when he had assured her that he no longer associated with Calm. She admitted that she told her husband what she had read in the police reports, and that she checked the LEAA system at Calm's request to determine whether police were investigating a domestic violence incident involving Calm and his girlfriend. Defendant denied telling her husband about the October 23, 2014 intelligence briefing but conceded on cross-examination that she may have told him about the reference to shell casings in the briefing.

Defendant told the jury that the September 16, 2014 text messages followed her husband's disclosure to her that she was being investigated, and that her expressions of disappointment in herself related to her frustration that she had not stopped her husband from engaging in illegal activity. She said

15

that the comment "[y]ou are not going to believe what I was told tonight" in one of her text messages referred to another officer's advice that she should leave her husband.

3.

The jury acquitted defendant of conspiracy but convicted her of both counts of official misconduct. It convicted Nathan Ingram of twenty-three charges.

The trial court sentenced defendant to an eight-year term of incarceration with five years' parole ineligibility on her first official misconduct conviction, and a concurrent seven-year term of incarceration with five years' parole ineligibility on her second official misconduct conviction.

B.

Defendant appealed her conviction and sentence. She contended that the trial court's admission of the September 16, 2014 text messages under the crime-fraud exception to the marital communications privilege violated federal and state prohibitions on ex post facto laws because the Legislature did not adopt that exception until November 9, 2015, more than a year after she and her husband exchanged the messages.[3] In the alternative, defendant argued

---

[3] Defendant raised six other issues before the Appellate Division; those issues are not before the Court in this appeal.

16

that the text messages did not satisfy the crime-fraud exception because they lacked specificity as to a future joint criminal enterprise.

The Appellate Division affirmed defendant's conviction and sentence. Relying on its decision in State v. Rose, 425 N.J. Super. 463, 468 (App. Div. 2012), the appellate court held that the amendment to N.J.R.E. 509 was a procedural rule that did not violate ex post facto laws when applied to admit text messages exchanged before the amendment. The Appellate Division ruled that the text messages met the requirements of the crime-fraud exception and that defendant was not prejudiced by the admission of the text messages given her acquittal of the charge of conspiracy.

## C.

We granted defendant's petition for certification, limited to the question of whether the marital communications privilege applies in this case. 246 N.J. 229 (2021). We granted the applications of the American Civil Liberties Union of New Jersey, the Association of Criminal Defense Lawyers of New Jersey, and the Attorney General to participate as amici curiae.

## III.

## A.

Defendant argues that the amendment to N.J.R.E. 509 is a "law that alters the legal rules of evidence, and receives less, or different, testimony,

than the law required at the time of the commission of the offense, in order to convict the offender." She contends that the amendment thus offends the ex post facto clause pursuant to Carmell v. Texas, 529 U.S. 513, 522 (2000). Defendant asserts that the admission of the disputed text messages was improper because there was no ongoing crime when the messages were exchanged, and that the trial court's ruling prejudiced her because the State used those messages to prove the charge of official misconduct.

B.

The State contends that this appeal does not implicate the ex post facto doctrine because the trial court did not retroactively apply the amendment to N.J.R.E. 509, which bars disclosure at trial, and the disputed communications are not within any of the categories of laws that the Supreme Court identified as ex post facto violations in Carmell. The State argues that the text messages did not lead the jury to a conclusion that it might not otherwise have reached.

C.

Amicus curiae the American Civil Liberties Union of New Jersey asserts that the trial court retroactively applied the crime-fraud exception to the marital communications privilege, thus materially altering defendant's substantive rights and violating ex post facto laws.

18

D.

Amicus curiae the Association of Criminal Defense Lawyers of New Jersey argues that unlike the hearsay exception addressed in Rose, the marital communications privilege creates a substantive right that could not be retroactively abrogated in defendant's trial.

E.

Amicus curiae the Attorney General urges the Court to apply the crime-fraud exception to the marital communications privilege regardless of the timing of the communications at issue, and to hold that a new exception to a privilege does not implicate the ex post facto doctrine.

IV.

A.

We review de novo the Appellate Division's legal determination that the trial court's application of the crime-fraud exception to the marital communications privilege to defendant's messages did not violate ex post facto laws. See State v. Patel, 239 N.J. 424, 435 (2019) ("We review issues of law de novo and owe no deference to the interpretive conclusions of either the Appellate Division or Law Division."); State v. Mann, 203 N.J. 328, 337

19

(2010) ("[A] reviewing court owes no deference to the trial court in deciding matters of law.").[4]

B.

The marital communications privilege, codified in N.J.S.A. 2A:84A-22 and N.J.R.E. 509, "prevents disclosure by a spouse of confidential communications made during marriage except under specified circumstances." State v. Szemple, 135 N.J. 406, 414 (1994). The "privilege 'stems from the strong public policy of encouraging free and uninhibited communication between spouses, and, consequently, of protecting the sanctity and tranquility of marriage.'" State v. Mauti, 208 N.J. 519, 533 (2012) (quoting Szemple, 135 N.J. at 414). The United States Supreme Court has described the privilege as "essential to the preservation of the marriage relationship." Wolfle v. United States, 291 U.S. 7, 14 (1934).

_____

[4] We do not review the trial court's decision admitting the text messages for plain error, as the State urges us to do. See R. 2:10-2 (authorizing appellate courts to "notice plain error not brought to the attention of the trial or appellate court" in the interests of justice). The record does not indicate that defendant waived her objection to the admission of the text messages; to the contrary, defendant moved before the trial court to exclude the messages, and the trial court and counsel discussed at oral argument the question whether the admission of the messages would violate ex post facto principles.

20

On September 16, 2014, when defendant and her husband exchanged the text messages at issue here, N.J.S.A. 2A:84A-22 and N.J.R.E. 509 provided in relevant part that

> [n]o person shall disclose any communication made in confidence between such person and his or her spouse unless both shall consent to the disclosure or unless the communication is relevant to an issue in an action between them or in a criminal action or proceeding in which either spouse consents to the disclosure, or in a criminal action or proceeding coming within [N.J.R.E. 501(2)].
>
> [N.J.S.A. 2A:84A-22 (2014); N.J.R.E. 509 (2014).[5]]

The version of N.J.R.E. 509 that was in effect in 2014 did not prescribe a crime-fraud exception to the marital communications privilege. See ibid. In that regard, N.J.R.E. 509's marital communications privilege contrasted with the attorney-client privilege, the physician-patient privilege, the cleric-penitent privilege, the trade secret privilege, and the mediation privilege, all of which included a crime-fraud exception. Terry, 218 N.J. at 241; see also N.J.R.E. 504(2)(a), 506(f), 511(2), 514, 519(b).

---

[5] N.J.R.E. 501(2) codifies a different marital privilege, the spousal testimonial privilege; with exceptions, that rule bars the spouse or partner of the accused in a criminal case from testifying in a criminal action. Terry, 218 N.J. at 233 n.1; N.J.S.A. 2A:84A-17(2).

In Terry, we held that the version of N.J.R.E. 509 then in effect shielded confidential communications between spouses that were intercepted by a wiretap. 218 N.J. at 234-39. We observed that

> but for the State's act of listening, pursuant to a wiretap order, the marital communication would have remained a private conversation between two spouses. If no one else had heard the conversation, the spouses could have chosen not to disclose it and ensured that it remained confidential -- consistent with the social policies the privilege is designed to protect.

> [Id. at 237.]

We agreed, however, with the State's contention that "the crime-fraud exception should apply to communications between spouses." Id. at 239. As we noted, "[t]he marital communications privilege is meant to encourage marital harmony, not to protect the planning or commission of crimes. The societal purpose behind the privilege is simply not served by safeguarding conversations between spouses about their joint criminal activities." Id. at 239-40. Observing that the then-current N.J.R.E. 509 "immunize[d] conversations between spouses about their ongoing and future joint criminal behavior," we stated "that the marital communications privilege should be updated to strike an appropriate balance between marital privacy and the public's interest in attaining justice." Id. at 240-41. We held that N.J.R.E. 509 "should be amended to include a crime-fraud exception that is similar to the

22

exceptions that apply in federal and state courts throughout the nation as well as other evidentiary rules in New Jersey." Id. at 241.

Recognizing that the proposed change "would modify the Rules of Evidence in a significant way," we invoked the Evidence Act of 1960. Id. at 239. That Act authorizes this Court to "adopt rules dealing with the admission or rejection of evidence, in accordance with the procedures set forth in this article." N.J.S.A. 2A:84A-33. We noted in Terry that the Evidence Act envisions "two different paths to adopt new evidence rules" -- the convening of a Judicial Conference to consider a draft of new evidence rules, and the submission of proposed evidence rules to the Senate and General Assembly for their approval by joint resolution and to the Governor for approval and signature. Id. at 242 (citing N.J.S.A. 2A:84A-34, -38; State v. Byrd, 198 N.J. 319, 342-43 (2009)).

Observing that "[a]dding a crime-fraud exception to the marital communications privilege would amount to a 'fundamental change' with 'serious and far-reaching consequences,'" we initiated the legislative process envisioned by the Evidence Act and "decline[d] to adopt the change on our own." Id. at 243 (quoting State v. D.R., 109 N.J. 348, 352, 375 (1988)).

23

On November 9, 2015, the Legislature amended N.J.S.A. 2A:84A-22 to create a crime-fraud exception to the marital communications privilege.  L. 2015, c. 138, § 2.  N.J.R.E. 509 was amended to conform to the change.

The Legislature declared that the marital communications "privilege arises from the strong public policy of encouraging free and uninhibited communication between spouses and partners, and, consequently, of protecting the sanctity and tranquility of marriages and civil unions."  Id. § 1(b).  It stated that "in its current form, this privilege also unintentionally serves to immunize conversations between spouses and partners about their ongoing and future joint criminal behavior."  Ibid.  The Legislature found that an amendment to N.J.R.E. 509 in accordance with the Court's proposal in Terry would "aid in preventing the unintended consequence of immunizing the criminal activity of certain spouses and partners who invoke the privilege, while preserving the general privilege and its intended purpose of protecting and encouraging free and uninhibited communication and confidence between spouses and civil union partners."  Id. § 1(d).

As amended, N.J.R.E. 509 provides in relevant part that

> [e]xcept as otherwise provided in this rule, no person shall disclose any communication made in confidence between such person and his or her spouse or civil union partner.  There is no privilege under this rule (a) if both spouses or partners consent to the disclosure; (b)

24

if the communication is relevant to an issue in an action between the spouses or partners; (c) in a criminal action or proceeding in which either spouse or partner consents to the disclosure; (d) in a criminal action or proceeding coming within Rule 501(2); or (e) in a criminal action or proceeding if the communication relates to an ongoing or future crime or fraud in which the spouses or partners were or are joint participants at the time of the communication.

[N.J.R.E. 509 (emphases added).]

The Legislature provided that the enactment would "take effect immediately." L. 2015, c. 138, § 3.

## C.

Defendant's constitutional challenge to the application of the amended version of N.J.R.E. 509 is premised on the clauses of the United States and New Jersey Constitutions that "prohibit the Legislature from passing ex post facto laws." State v. Brown, 245 N.J. 78, 87-88 (2021) (citing U.S. Const. art. I, § 10, cl. 1; N.J. Const. art. IV, § 7, ¶ 3).[6]  That constitutional bar ensures "that legislative [a]cts give fair warning of their effect and permit individuals

---

[6] New Jersey's constitutional provision barring ex post facto laws has been construed consistently with the United States Supreme Court's interpretation of its federal counterpart.  Brown, 245 N.J. at 88; Doe v. Poritz, 142 N.J. 1, 42 (1995).

to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. 24, 28-29 (1981).

The ex post facto doctrine "thus advances two primary purposes: 'It assures that individuals can rely on laws until they are "explicitly changed," and it restricts the government from passing "potentially vindictive legislation."'" Brown, 245 N.J. at 88 (quoting Riley v. State Parole Bd., 219 N.J. 270, 284 (2014)).

As we observed in an ex post facto challenge to an amendment to the Megan's Law sentencing scheme, "[a]n ex post facto law is defined by two critical elements. '[F]irst, the law "must be retrospective, that is, it must apply to events occurring before its enactment"; and second, "it must disadvantage the offender affected by it."'" State v. Hester, 233 N.J. 381, 392 (2018) (second alteration in original) (quoting Miller v. Florida, 482 U.S. 423, 430 (1987)); accord Brown, 245 N.J. at 88.

In Carmell, the United States Supreme Court reaffirmed its prior holding identifying four categories of laws that violate the ex post facto doctrine if applied retroactively to conduct that occurred before the challenged law was in effect. 529 U.S. at 521-30 (discussing Calder v. Bull, 3 U.S. (3 Dall.) 386, 389-91 (1798)). Those categories are: (1) "[e]very law that makes an action done before the passing of the law, and which was innocent when done,

26

criminal; and punishes such action"; (2) "[e]very law that aggravates a crime, or makes it greater than it was, when committed"; (3) "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; and (4) "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Id. at 522 (emphases omitted) (quoting Calder, 3 U.S. at 390). The Supreme Court held that the fourth category encompasses both "laws that lower the burden of proof and laws that reduce the quantum of evidence necessary to meet that burden." Id. at 541.

The Supreme Court contrasted the four categories of laws that raise ex post facto concerns with "[o]rdinary rules of evidence," which "do not violate the [c]lause." Id. at 533 n.23. It explained,

> Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as "unfair" or "unjust," they do not implicate the same kind of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard.
>
> [Ibid.]

27

In Rose, the Appellate Division relied on Carmell to reject an ex post facto challenge to the forfeiture by wrongdoing exception to the hearsay rule. Rose, 425 N.J. Super. at 468-71.[7] The Appellate Division declined to limit the new exception "to cases where the defendant's wrongdoing occurred after July 1, 2011," the new rule's effective date. Id. at 467-68. Instead, it applied "well-settled principles that new rules relating only to modes of procedure and the conduct of trials, in which no one can be said to have a vested right, apply if they are in effect at time of trial, regardless of when the underlying crime was committed." Id. at 468 (citing State v. Nagle, 226 N.J. Super. 513, 516-17 (App. Div. 1988)).

Relying on the United States Supreme Court's holding in Carmell that "ordinary rules of evidence" do not raise ex post facto concerns, the Appellate Division concluded that retroactive application of the new evidence rule to misconduct preceding the rule's effective date did not offend the ex post facto clause. Id. at 469-71. It held "that N.J.R.E. 804(b)(9) may be applied

---

[7] The forfeiture by wrongdoing exception to the hearsay rule authorizes the admission of a hearsay statement by an unavailable declarant "against a party who has engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." N.J.R.E. 804(b)(9).

retroactively to reach purported wrongdoing predating the rule's enactment." Id. at 473.

As we recently noted, in accordance with Rose, "new rules of evidence that do not lower the level of proof needed to convict a defendant generally apply at trial, even if they are adopted after the commission of a crime but before trial." State v. Sanchez-Medina, 231 N.J. 452, 467 (2018) (citing Rose, 425 N.J. Super. at 468-70).

## D.

When the Legislature adopts or changes an ordinary rule of evidence, such as the hearsay exception at issue in Rose, the amendment applies to all trials and hearings conducted pursuant to the Rules of Evidence on or after its effective date, even when the defendant's alleged conduct preceded that date. See ibid.; Rose, 425 N.J. Super. at 471-72. As the United States Supreme Court confirmed, such rules of evidence -- purely procedural and evenhanded in their application -- do not raise ex post facto concerns. Carmell, 529 U.S. at 533 n.23.

This appeal, however, does not involve an ordinary rule of evidence, but a privilege. Privileges are incorporated in the Rules of Evidence and assigned rule numbers, but their codification in evidence rules is "a matter of convenience." Off. cmt. on N.J.R.E. 500; see also Biunno, Weissbard &

29

Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 500 (2022). Privileges apply "universally, not just in court proceedings governed by the Rules of Evidence." Biunno, Weissbard & Zegas, cmt. 1 on N.J.R.E. 500; see N.J.R.E. 101(a)(2) (stating that "[t]he provisions of Rule 500 (privileges) shall apply, without relaxation, to all proceedings and inquiries, whether formal, informal, public or private, and to all branches and agencies of government").

Most importantly, privileges implicate policy considerations not raised by exceptions to the hearsay rule or other rules of evidence. With "deep roots in our jurisprudence," they codify "'a societal judgment that the need for confidentiality outweighs the need for disclosure.'" Mauti, 208 N.J. at 531 (quoting Payton v. N.J. Tpk. Auth., 148 N.J. 524, 539 (1997)). "[P]rivileges protect interests and relationships that have been determined to be 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'" Ibid. (quoting M. v. K., 186 N.J. Super. 363, 371 (Ch. Div. 1982)). The Legislature recognizes a privilege "in situations where the social policy in support of nondisclosure is weightier than the evidence it renders unavailable." C.A. ex rel. Applegrad v. Bentolila, 219 N.J. 449, 479 (2014) (Cuff, P.J.A.D., dissenting); see also Off. cmt. on Evid. R. 23-40 (noting that privileges "reflect legislative determinations of public policy considered to be more important than the evidence excluded").

30

Moreover, the crime-fraud exception to a privilege is not in the category of evidentiary rules that are "ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case." Carmell, 529 U.S. at 533 n.23. Instead, the amendment at issue in this appeal uniformly benefits the State in its prosecution of criminal defendants. See generally N.J.R.E. 509.

Given the unique status of privileges in our law, we do not view the retrospective application of the evidence rules at issue in Rose and similar cases to govern this appeal. Rather, we find the "general rule of statutory construction that favors prospective application of statutes" more appropriate to consideration of the privilege at issue here. See In re Registrant J.D.-F., 248 N.J. 11, 21 (2021) (quoting Gibbons v. Gibbons, 86 N.J. 515, 521 (1981)). We decline to infer that the Legislature sought to retroactively abrogate or eliminate a privilege absent clear evidence of legislative intent. See, e.g., In re Registrant G.H., 240 N.J. 113, 114 (2019) (affirming an Appellate Division decision holding that a Megan's Law provision does not apply retroactively upon finding "no statement of legislative intent, express or implied, that [N.J.S.A. 2C:7-2(g)] should be applied retroactively").[8]

---

[8] Our ruling is limited to the setting of this appeal. We reiterate the general rule that when the Legislature amends a rule of evidence and identifies the effective date of the amendment, the rule as amended governs trials conducted on or after the effective date, even when the conduct at issue predated the amendment. See, e.g., State v. Cope, 224 N.J. 530, 555-56 (2016) (agreeing

31

The Legislature could have directed that the crime-fraud exception would apply to marital communications that preceded the amendment's effective date. See, e.g., State v. Fournier, 965 A.2d 1091, 1094 (N.H. 2009) (construing a New Hampshire statute, N.H. Rev. Stat. Ann. § 135-E:19 (2008), to retroactively abrogate the testimonial privileges of certain persons in certain sexually violent offender civil commitment proceedings given the New Hampshire Legislature's statement that the statute "applies retroactively to all persons in custody as of January 1, 2007"). The November 9, 2015 amendment to N.J.R.E. 509, however, is devoid of any indication that the Legislature intended to apply the crime-fraud exception to marital communications conducted prior to the change in the law. L. 2015, c. 138.

To the contrary, the Legislature stated that the amendment would "take effect immediately," id. § 3, thus choosing language that is generally construed to denote prospective effect, see State v. Lane, ___ N.J. ___, ___ (2022) (slip op. at 14-16); Pisack v. B & C Towing, Inc., 240 N.J. 360, 371 (2020); In re Registrant G.H., 240 N.J. at 113-14, aff'g 455 N.J. Super. 515, 521 (App. Div.

_____

with the Appellate Division that the amended version of N.J.R.E. 609, effective at the time of the decision, would apply to the new trial on remand); Rose, 425 N.J. Super. at 467-68 (applying N.J.R.E. 804(b)(9) to the defendant's trial); State v. Kittrell, 279 N.J. Super. 225, 235 n.3 (App. Div. 1995) (explaining that the Rules of Evidence in effect at the time of trial govern the trial).

32

2018); State v. Parolin, 171 N.J. 223, 233 (2002). The Legislature did not remotely suggest -- let alone expressly state -- that pre-amendment communications, shielded by the marital privilege when they occurred, would be stripped of that protection by virtue of the amendment. L. 2015, c. 138.

In the absence of evidence of legislative intent that the amendment to N.J.R.E. 509 would retroactively abrogate a privilege, we view that amendment to apply prospectively to marital communications that were made on or after the effective date.

That construction is consistent with the doctrine of constitutional avoidance. See State v. Carter, 247 N.J. 488, 520 (2021) (stating that, in some settings, "the doctrine of constitutional avoidance calls for a narrow interpretation"); State v. Pomianek, 221 N.J. 66, 90-91 (2015) ("We . . . assume that the Legislature would want us to construe the statute in a way that conforms to the Constitution.").

Accordingly, the crime-fraud exception to the marital communications privilege does not apply to the text messages at issue in this appeal. Those text messages were "made in confidence between [a] person and his or her spouse" within the meaning of the pre-amendment version of N.J.R.E. 509, and the messages did not fall within any of the exceptions set forth in the rule at that time. See N.J.R.E. 509 (2014). The fact that investigators lawfully obtained

33

the text messages in the course of their investigation does not affect the communications' privileged status. See Terry, 218 N.J. at 234-39. Those messages were therefore inadmissible at defendant's trial.

D.

1.

We next consider whether admission of the text messages at trial was reversible error.

"An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' -- that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" State v. J.L.G., 234 N.J. 265, 306 (2018) (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)); accord State v. Williams, 244 N.J. 592, 608-09 (2021); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:7-5 (2022) (stating that if an error is not "capable of producing an unjust result or a result that would otherwise not have been reached," that error is "harmless and subject to being disregarded").

Defendant was convicted of two counts of official misconduct in violation of N.J.S.A. 2C:30-2(a). That statute provides that

> [a] public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:

34

> a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner.

[N.J.S.A. 2C:30-2(a).]

To convict defendant of official misconduct under N.J.S.A. 2C:30-2(a), the State was required to prove beyond a reasonable doubt that

> (1) defendant was a "public servant" within the meaning of the statute (2) who, with the purpose to obtain a benefit or deprive another of a benefit, (3) committed an act relating to but constituting an unauthorized exercise of her office, (4) knowing that such act was unauthorized or that she was committing such act in an unauthorized manner.

[State v. Saavedra, 222 N.J. 39, 58 (2015).]

"[T]here is no requirement that the defendant's activity be criminal under any other section of the Code in order to constitute the crime of official misconduct" under N.J.S.A. 2C:30-2. Cannel, N.J. Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:30-2 (2022). "The benefit need not be to the public official; it may be paid to a third party." Id. at cmt. 3.

The State alleged that defendant committed the offense of official misconduct in two respects: first, by accessing police reports about the targets of the drug distribution network and disclosing information to unauthorized persons outside of the Camden County Police Department; and second, by

35

disclosing information from the intelligence briefing to unauthorized persons outside of the Department.

2.

The September 16, 2014 text messages between defendant and Edwin Ingram could reasonably be interpreted to suggest that defendant had told her husband that she was the subject of an Internal Affairs investigation, that she knew she had jeopardized her position as a police officer to assist him, and that he sought to reassure her about the import of that investigation. Those messages generally supported the State's theory that defendant improperly disclosed confidential information to her husband in an effort to assist him and his associates to avoid prosecution.

The State also presented substantial evidence as to each element of official misconduct that was independent of the text messages, however.

First, as she admitted in two statements to police that were presented to the jury, defendant accessed thirteen police reports on the LEAA system regarding Edwin Ingram, Calm, Webb, and others on June 10 and 19, 2014, even though she had no involvement in any investigation regarding those individuals and that activity was outside the scope of her duties. She acknowledged that she made personal use of the police department computer system.

Although defendant contended that she accessed the reports only to assess the truthfulness of her husband's statement that he was no longer associated with participants in the drug trade, the State offered evidence that she sought reports unrelated to her husband. Defendant conceded that she used the LEAA system to locate information requested by Calm, who was concerned that he was under investigation for domestic violence.

In addition, the State presented provisions of department regulations and the code of ethics governing defendant in support of its contention that she knowingly violated department procedure by accessing the reports.

The State also offered evidence relevant to the "benefit" element of the official misconduct offense, contending that by misusing the LEAA system, defendant helped Edwin Ingram and his associates evade prosecution and continue their lucrative distribution of drugs. Indeed, defendant admitted during her cross-examination before the jury that if confidential police information is disclosed to drug dealers, it is beneficial to them.

Second, prosecutors offered a timeline of defendant's and Edwin Ingram's telephone calls to targets of the investigation that, if credited by the jury, supported the State's contention that defendant told her husband and his associates that police officers had secured court orders to wiretap their phones. It presented evidence of an abrupt decline in the volume of calls between

37

defendant and the targets of the investigation around August 13, 2014 -- the date that the wiretaps commenced. That evidence was relevant to the "benefit" and "unauthorized exercise" elements of defendant's official misconduct charges, as well as the requirement that the State prove defendant's knowledge that her actions were improper.

Third, the State presented to the jury the recording of a wiretapped call between Calm and Anderson on September 16, 2014, in which Calm told Anderson that an unidentified person was "scared as hell" and was "wondering why IA was near his crib." The State contended that the discussion was about Edwin Ingram, who had learned from defendant that she was the subject of an Internal Affairs investigation and was alarmed by that development. That evidence, if believed by the jury, further supported the allegation that defendant knowingly disclosed confidential information regarding a police investigation in order to confer a benefit on Edwin Ingram and his associates.

Fourth, the State presented evidence regarding the October 23, 2014 briefing attended by defendant and its aftermath. It revealed to the jury the content of that briefing -- including the report of a ballistics match between shell casings found after a shooting and shell casings found after another incident near Calm's home.

The State offered GPS evidence showing that defendant returned home twice immediately following the briefing. Defendant admitted to disclosing information that she learned from the briefing to her husband. The State presented evidence derived from wiretapped calls and surveillance supporting its contention that Webb knew the morning of the briefing about the ballistics match and urgently contacted Calm to provide that information to him. It also presented a recording of a wiretapped conversation indicating that Calm, aware he was under investigation, contemplated an emergency relocation out of state.

Thus, as to each of the four elements of the official misconduct charges, the State presented overwhelming evidence, including defendant's significant admissions.

Considered in its entirety, the trial record does not suggest that the improper admission of the text messages under the crime-fraud exception to the marital privilege "led to an unjust verdict -- that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" J.L.G., 234 N.J. at 306 (quoting Macon, 57 N.J. at 335-36); see also Pressler & Verniero, cmt. on R. 1:7-5.

Accordingly, the trial court's error was harmless, and the Appellate Division properly affirmed defendant's conviction.

39

## V.

The judgment of the Appellate Division is affirmed as modified.

CHIEF JUSTICE RABNER; JUSTICES ALBIN, SOLOMON and PIERRE-LOUIS; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PATTERSON's opinion.